

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,

        Plaintiff,

-v-                        Case No. 1:11-CR-115

JORGE AVILA TORREZ.

        Defendants.

### Memorandum Opinion

### Overview

The Defendant Jorge Avila Torrez is charged with one count of first-degree murder, for the murder of Amanda Snell, within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1111 and 7(3). Jury selection for his trial is set to begin March 18, 2013 at 10am. The parties have filed several motions in anticipation of the trial. The following motions are now before the Court:

1. Government's Notice of Intent to Offer Evidence Pursuant to FRE 404(B) (Dkt. No. 149)
2. Defendant's Motion to Suppress Statements to Jailhouse Informants (Dkt. No. 159)
3. Defendant's Motion to Suppress Statements to Law Enforcement (Dkt. No. 160)
4. Defendant's Motion to Exclude Extrajudicial Statements Due to Lack of Corpus Delicti (Dkt. No. 161)
5. Defendant's Motion to Exclude Cooperating Witness Testimony (Dkt. No. 163)

### Analysis

Throughout its consideration of these motions, the Court is mindful that this is a capital

1

case. It is well aware of, and of course deferential to, Supreme Court precedent which requires an increased reliability of process in capital cases, and demands accuracy, consistency, and careful reasoning by the court in a capital matter. *See, e.g., Herrera v. Collins*, 506 U.S. 390 (1993); *Sawyer v. Smith*, 497 U.S. 227 (1990); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

### 1. Government's Notice of Intent to Offer 404(b) Evidence

On October 1, 2012, the government announced its intention to offer certain evidence at trial pursuant to Federal Rule of Evidence 404(b). Rule 404(b) requires prosecutors, on request, to provide timely notice (a requirement easily satisfied here) of their intent to introduce evidence of the defendant's past crimes, wrongs, or other acts.

The fundamental distinction in evidence law is between relevant and irrelevant evidence. As a baseline, evidence which tends to make a fact material to the case more or less probable is relevant and therefore admissible. Fed. R. Evid. 401-02. Rule 404(b)(1) creates an exception to the baseline by excluding evidence of a crime, wrong, or other act offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance [therewith]." But in the next section the rule clarifies that prior bad acts evidence *may* be admissible for other purposes, and gives several examples of reasons such evidence might be admitted. Fed. R. Evid. 404(b)(2). The Fourth Circuit interprets the interaction of the parts of Rule 404(b) as creating a "rule of inclusion," and considers the rule's list of reasons to admit bad acts evidence non-exhaustive. *United States v. Queen*, 132 F.3d 991, 994-95 (4th Cir. 1997). To determine whether evidence is admissible under Rule 404(b), the Fourth Circuit asks whether the evidence is "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." *United States v. Wells*, 163 F.3d 889, 895 (4th Cir. 1998). "Evidence is necessary where, considered in

light of other evidence available . . . , it is an essential part of the crime charged." *Queen*, 132 F.3d at 998. Evidence is reliable if it could reasonably be believed by a rational and properly instructed juror. *United States v. Hornsby*, 666 F.3d 296, 308 (4th Cir. 2012). Of course, Rule 403 also applies, so any evidence whose probative value is substantially outweighed by its prejudicial, confusing, or dilatory nature must also be excluded.

In this case, the government has identified four categories of evidence it would like to introduce at trial pursuant to Rule 404: (1) evidence showing that Mr. Torrez was familiar with a particular chokehold technique; (2) evidence that Mr. Torrez stalked and attacked three women in northern Virginia several months after the crime alleged in this case; (3) evidence that Mr. Torrez committed two murders in Zion, Illinois in 2005; and (4) evidence that Mr. Torrez viewed pornographic videos and websites depicting rape and other violent sexual activity, and also searched the internet for information about chloroform, within several months of the crime alleged in this case.

*Chokehold Technique*

The government seeks to introduce evidence that Mr. Torrez is familiar with a "sleeper hold" or "figure four chokehold." The government apparently anticipates this evidence coming from three sources, a childhood friend of Mr. Torrez's who was placed in a sleeper hold by Mr. Torrez growing up, a martial arts training partner of Mr. Torrez's during his time in Keith Hall who practiced the figure four chokehold with Mr. Torrez, and a confidential informant to whom Mr. Torrez allegedly admitted he was familiar with the figure four chokehold and that he used the technique on Ms. Snell.

The government argues that this evidence need not even be considered under rule 404(b)

3

because it is intrinsic to the charged offense, *see United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010), but that it is disclosing its intention anyway out of an abundance of caution. If it is the government's theory that Ms. Snell was choked either to unconsciousness or death, then it is correct that the chokehold techniques are admissible without 404(b) consideration because the evidence is intrinsic to the offense charged.

Even if the evidence were not intrinsic, it would be admissible under 404(b) because Mr. Torrez's knowledge of chokeholds is relevant to issues other than his character, namely knowledge of the likely consequences of applying such holds, which speaks to absence of mistake and intent. The last, intent, is of particular importance because it is a necessary element of the crime with which Mr. Torrez is charged. The evidence easily meets the low bar required for reliability; the government intends to offer testimony from two individuals directly familiar with Mr. Torrez's chokehold knowledge, and one confidential informant whom a rational juror could certainly believe after proper jury instructions. The Court sees no particular prejudice to allowing the jury to hear that Mr. Torrez was proficient in certain wrestling moves. This is not necessarily an indicator of bad character, especially for someone who was serving in the military at the time.

The government is not barred by Rule 404(b) from offering evidence at trial to show that Mr. Torrez was familiar with figure four and sleeper chokeholds, that he had employed them in the past, and that he was aware of the likely consequences of applying the holds.

*Arlington Offenses*

The government intends to offer at trial evidence of crimes for which Mr. Torrez is currently serving prison sentences (collectively "the Arlington offenses"). Mr. Torrez stalked and

4

threatened a 26-year-old woman, C.N., on February 10, 2010. On February 27 he stalked two other young women, J.T. and K.M., and restrained them in one of the women's homes using electrical cords from household appliances to bind them. He then removed J.T. from the house, raped her, and attempted to kill her and leave her in the woods (she ultimately survived). The government would like to introduce evidence related to those crimes, and also evidence that Mr. Torrez allegedly attempted to arrange for the victims to be harmed or intimidated in the lead-up to his trial on those charges.

The Court considers the Arlington offenses relevant primarily to establishing Mr. Torrez's intent. In order to be convicted of first degree murder under 18 U.S.C. § 1111, Mr. Torrez must be proven to have killed Ms. Snell with "malice aforethought," which means either that the murder was malicious and premeditated, or that it was committed in an attempt to perpetrate, *inter alia*, kidnapping or sexual abuse.

The Arlington offenses make it more likely that Mr. Torrez had formed the requisite intent either for directly premeditated murder or the intent to commit kidnapping or sexual abuse, all of which were part and parcel of the Arlington offenses. Although the Arlington offenses occurred after the crime now charged, "subsequent conduct may be highly probative of prior intent," because it is evidence that "one's thought patterns had already been so developed and were so operating on another previous occasion." *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982).

Of course, in order for the crimes to be relevant to intent they must be similar in nature to the offense charged. The similarity may manifest as physical similarity of the acts or as the defendant's indulging himself in the same state of mind in the perpetration of both offenses. *Queen*, 132 F.3d at 996. The most obvious similarity between the charged offense and the

Arlington offenses is the intent to gratify a sexual urge. The presence of Mr. Torrez's semen on Ms. Snell's bed sheets strongly indicates a sexual intent. The fact that there is no evidence of physical sexual assault of Ms. Snell is not as damaging to the prosecution's argument as it might first seem. Before Mr. Torrez's rape of J.T., he put on a condom and told her, "I'm not stupid." Mr. Torrez's conscientious efforts to keep his DNA from being found directly on the victims are additional similarities between the offenses. Finally, the relatively close temporal relationship between the death of Ms. Snell and the Arlington offenses suggests that the latter is probative of intent for the former. *Compare with Hadaway*, 681 F.2d at 217 (admitting 404(b) evidence of acts that occurred 18 months after the crime charged).

Similarities between the Arlington offenses and Ms. Snell's alleged murder are also relevant to the identity of the perpetrator. While the defense rightfully points out differences between the incidents, the bar for relevance is relatively low. *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998). The Court has considered the list of similarities offered by the prosecution on pages 22-23 of their notice. It is most convinced by the fact that both the Arlington offenses and the charged offense involved assault of women in their early- to mid-twenties during the early morning hours, with a sexual motive, and that the charged offense allegedly involved binding the victim's hands with an electrical cord, as did the kidnapping of J.T. and K.M. in Arlington.

Relevance is not enough, however. The Arlington offense evidence must also be necessary before it can be admitted. As discussed above, intent is a critical element of the crime with which Mr. Torrez is charged, and there is scant evidence available to prove Mr. Torrez's intent on the night in question. The Arlington offense evidence is clearly necessary.

The reliability of the Arlington offense evidence is quite high. Mr. Torrez has been tried

and convicted of those crimes. It is almost axiomatic that a rational, properly instructed juror could believe that he committed the acts.

The potential prejudice to Mr. Torrez of the jury hearing the details of the Arlington offenses does not outweigh their probative value. The Arlington offenses are no more "sensational" or disturbing than the crime with which Mr. Torrez is currently charged, which helps to tip the balance in favor of admitting the evidence. *See United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995). The similarity between the incidents helps make the Arlington offenses probative and also not overwhelmingly prejudicial.

The Court notes the government's desire to use evidence of the Arlington offenses to corroborate the truthfulness of its confidential informants, and to bolster the credibility of the statements Mr. Torrez made to the informants. The Arlington offense evidence is also relevant for those reasons, and it could be admitted under Rule 404(b) on that theory as well.

The Court makes three exclusions to its allowance of Arlington offense evidence. First, the government may not offer any evidence of what happened to J.T. after Mr. Torrez left her on February 27, 2010. The story of J.T.'s rescue and the difficulty of her recovery is not relevant to the charged offense. Second, the government may not offer evidence about the Arlington offenses that was not offered during the trial for those offenses. If there are additional details that the prosecution hopes to introduce at this trial, it must make the Court and Mr. Torrez aware of its intention, and they will be addressed separately. Third, the government may not offer evidence of Mr. Torrez's alleged attempts to arrange intimidation of, or harm to, witnesses to the Arlington offenses. Those alleged crimes are not relevant to the charged offense, nor are they necessary to the government's case.[1]

---

[1] There are scenarios in which Mr. Torrez might take the stand and make the alleged attempts at

7

Besides the exceptions just mentioned, the government is not barred by Rule 404(b) from offering evidence at trial regarding the details of the Arlington offenses, including such details as were relayed to the government's confidential informants. The government must take all necessary measures to cleanse the statements of confidential informants—in writing, recorded, and testimonial—to protect the jury from hearing evidence that falls within the exceptions noted above.

*Zion Murders*

In May 2005, two young girls were brutally murdered in Zion, Illinois. The prosecution would like to introduce evidence at trial that links Mr. Torrez to the Zion murders. The prosecution argues that the evidence is relevant because it will be used to corroborate statements Mr. Torrez made to confidential informants, allegedly confessing to the 2005 murders.

The Court considers the Zion murders too remote temporally and too distinct factually, as compared to the Arlington offenses, to be relevant to intent or identity. Although there is evidence the Zion murders were sexually motivated, the other similarities that the Court considers important—such as the age of the victims, the time of day of the offenses, the unique use of an electrical cord for binding hands and feet—are not present in the Zion murders.

The government would like to introduce evidence of the Zion murders because it would corroborate statements Mr. Torrez made to confidential informants, thereby increasing the likelihood that other statements Mr. Torrez made to the informants were true. While the truthfulness of the statements Mr. Torrez made to the informants may well be contested, the

---

witness intimidation relevant. The government should notify the Court and Mr. Torrez if it intends to cross examine him on that point, or to call rebuttal witnesses to testify about the intimidation.

404(b) evidence offered on that point is inadmissible in the government's case in chief because it is not necessary to the prosecution. The government argues that the statements are necessary in that they are some of the best evidence available to the prosecution, that is not sufficient to overcome the extremely prejudicial nature of the Zion murders, which were both more sensational and more disturbing than the Arlington offenses,[2] owing to the age of the victims and the brutality of the murders. The probative value of the Zion murder evidence is further decreased by the factual differences between the Zion murders and the charged offense, and also the substantial time gap between the two. Whatever probative value evidence of the Zion murders might have in corroborating Mr. Torrez's jail cell confessions, it is substantially outweighed by its highly prejudicial nature.

Because the Zion murders themselves are not relevant (or only tangentially so), Mr. Torrez's statements to the government's informants about his alleged involvement cannot be admitted.[3] While they might tend to increase the likelihood that statements Mr. Torrez made to the informants were accurate and truthful, subjecting the jurors to the horrific story of the Zion murders would be extremely prejudicial and only probative of the informant's reliability in an attenuated way. The government must take all necessary measures to cleanse the statements of confidential informants—in writing, recorded, and testimonial—to protect the jury from the prejudice of hearing any details of the Zion murders or Mr. Torrez's alleged involvement in them.

*Internet Search History and Computer Contents*

---

2  This is, of course, speaking strictly in the context of weighing evidence. It is not to discount the horror that the victims of the Arlington offenses, and in particular J.T., endured.
3  The Zion murder might become relevant on cross examination as impeachment evidence if Mr. Torrez presents evidence that his alleged confessions to confidential informants were fabrications.

9

The government intends to introduce forensic analysis of Mr. Torrez's computer performed following his arrest for the Arlington offenses in February 2010. The evidence found on his computer includes pornographic videos of women being bound and raped, and sexually assaulted while sleeping. It also includes Mr. Torrez's internet browsing history, which indicates he visited websites featuring thematically similar content, and also that he ran internet searches on how to make or otherwise obtain chloroform.

Mr. Torrez argues that the videos described are not illegal, and that admitting them would suggest that in any murder trial evidence that the accused had watched violent movies could be admitted. The Court disagrees.

The material at issue is relevant to show Mr. Torrez's intent and motive. As discussed above, "subsequent conduct may be highly probative of prior intent," because it is evidence that "one's thought patterns had already been so developed and were so operating on another previous occasion." *Hadaway*, 681 F.2d at 217. Mr. Torrez is charged with murdering a woman he (presumably) found sleeping. He allegedly rendered her unconscious, may have bound her hands and feet, and the semen he left on her bed sheet suggests a sexual motive. The videos on his computer and the websites he visited suggest that sexual violence against women—and especially sexual violence against sleeping, unconscious, or restrained women—was compelling to Mr. Torrez, and they make it more likely that it was his intent to commit such violence when he allegedly entered Ms. Snell's room.

As discussed in a previous section, evidence going to intent is necessary because intent is an element of the charged offense and it will be difficult to prove given the circumstances of the case. Mr. Torrez has not contested the reliability of the forensic analysis, and the Court has no reason to doubt its trustworthiness.

Mr. Torrez's possession of certain types of pornography, and his history of related internet browsing, are (as the defense points out) perfectly legal. The Court believes their legality will translate to a minimal prejudicial effect on the jury, so that the prejudicial effect of Mr. Torrez's legal computer-related activity will not outweigh its probative value.

For these reasons, the results of forensic analysis of Mr. Torrez's computer, as described in the government's 404(b) notice, are admissible.

## 2. Defendant's Motion to Suppress Statements to Jailhouse Informants under the Sixth Amendment

Mr. Torrez made statements to confidential informant CI-2 while he was incarcerated in August 2010, awaiting trial on the Arlington offenses. The statements included information about the capital offense with which he is now charged and also the Zion murders. CI-2 was recording the statements in cooperation with law enforcement. Mr. Torrez had been indicted and appointed counsel in the Arlington offenses, but he had not yet been indicted and was not represented by counsel on the current charge (that indictment came in May 2011). Mr. Torrez now seeks to exclude the statements under the Sixth Amendment and *Massiah v. United States*.

Sixth Amendment right to counsel attaches at arraignment. *Massiah v. United States*, 377 U.S. 201, 205 (1964). After the right to counsel has attached, the government may not use a confidential jailhouse informant to act as anything more than a "listening post;" he cannot "participate[] in active conversation [] or prompt[] replies" because to do more is the equivalent of an interrogation without counsel. *Kuhlmann v. Wilson*, 477 U.S. 436, 456 n.19 (1986). In this case, CI-2 participated in conversation. The right to counsel is offense-specific, so generally an informant can participate in a conversation with an inmate about an offense for which the inmate

has not yet been arraigned.

Mr. Torrez argues that all of his statements to CI-2 must be excluded because statutory aggravating factors are a necessary element of capital murder under the Federal Death Penalty Act. He claims that this makes the Arlington offenses (as necessary elements of capital murder) the "same offense" as Ms. Snell's alleged murder under double jeopardy analysis. If they are the same offense, then Mr. Torrez believes that his right to counsel for the offense charged here attached as soon as he was arraigned for the Arlington offenses because they are the same. *See Texas v. Cobb*, 532 U.S. 162, 173 (2001).

Mr. Torrez's argument fails because the Arlington offenses are not the same as the charged offense under jeopardy analysis. The test for sameness in the jeopardy context is whether each offense requires proof of an additional fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The government argues that the offenses are separate because all that need be proved for the capital murder charge is the *conviction* for the other offenses, not the elements of those offenses.

Mr. Torrez cites *United States v. Sykes*, 131 S. Ct. 2267 (2011), for the proposition that proof of a conviction is the same as proof of the elements of the crime. In *Sykes*, the Supreme Court was concerned with a sentencing enhancement under the Armed Career Criminal Act, and whether a "violent felony" (which qualified the defendant for the enhancement) should be determined by the required elements of the offense or by the conduct of the particular offender. *Id.* at 2270. The Court held that it was permissible to define a felony as "violent" based on the general elements of the offense, and that it could be counted against an offender for the purposes of the ACCA even if the conduct of the offense was not particularly violent. *Id.* at 2284.

This Court declines to extend the reasoning of *Sykes* to the current context. There is no

reason to think that a categorical approach to determining whether a felony is violent translates to an identity of proof of conviction and the elements of conviction for the purposes of statutory aggravators in a death penalty case. The Court notes that by Mr. Torrez's reasoning, the Arlington offenses and the charged offense would be the same for double jeopardy purposes, and this prosecution would therefore be entirely barred by the Fifth Amendment.

The defense's argument is novel, but it does hold up under regular jeopardy analysis, and accepting it would lead to an absurd result. Mr. Torrez's statements to CI-2 will not be barred on Sixth Amendment grounds.

### 3. Defendant's Motion to Suppress Statements to Law Enforcement

Mr. Torrez filed a motion to exclude statements he made to police at the Arlington Detention Center on June 27, 2010 and September 8, 2010 because he believes his Fifth Amendment right to counsel was violated. After receiving additional discovery from the government, it appears that Mr. Torrez concedes he waived his *Miranda* rights at the beginning of the June 27 and September 8 hearings, and so now moves only to exclude statements made after he allegedly invoked his right to counsel during the June 27 interview.

Before addressing the supposed invocation on June 27, the Court notes that there is sufficient evidence to show that Mr. Torrez did indeed waive his *Miranda* rights before beginning both the June 27 and September 8 interviews. On June 27 Detective Ulloa verbally advised Mr. Torrez of his *Miranda* rights, confirmed that he understood, and then obtained a written waiver of those rights. Before the interview on September 8, Detective Helgesen verbally advised Mr. Torrez of his *Miranda* rights, made sure that he understood them, and then obtained his signature on a written waiver. The Court has reviewed the recording of both the June 27 and

September 8 interviews and finds that Mr. Torrez's waivers of his rights were made voluntarily and knowingly.

In order for the waiver to be considered voluntary, Mr. Torrez's will must not have been overborne, nor "his capacity of self-determination critically impaired because of coercive police conduct." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002). Far from being overborne or coerced, Mr. Torrez is perfectly calm throughout both interviews. His demeanor mirrors that of Detectives Ulloa and Helgesen, whose interview styles are not at all intimidating or coercive. All involved give the impression of being at ease and well within their own faculties.

In considering whether the waivers were knowingly given, the Court looks at "the totality of the circumstances surrounding the interrogation[s], including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver[s] to the giving of the *Miranda* warnings." *United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012). Mr. Torrez is a high school graduate who reads and writes well—the Court has received at least one very cogent letter handwritten by Mr. Torrez. It is clear from the recorded interviews that Mr. Torrez is bright and at least somewhat familiar with the criminal justice system. In fact, Mr. Torrez was obviously aware of his right to counsel and comfortable invoking it, because he eventually unequivocally requested a lawyer on September 8 (at which point the interview ceased). Both the June 27 and September 8 waivers were obtained immediately before the interviews began.

The Court finds that Mr. Torrez knowingly and intelligently waived his *Miranda* right to counsel before the June 27 and September 8 interviews. The Court finds further that the September 8 interview ceased promptly after Mr. Torrez's request for counsel. Therefore, the only question left is whether Mr. Torrez invoked his right to counsel during the June 27

interview, and whether that would necessitate exclusion of any statements made after the invocation.

Approximately two hours into the June 27 interview, Detective Ulloa had just told Mr. Torrez that his DNA connected him to the scene of the murder of two young girls in Zion, Illinois and referenced a report that said as much. Detective Ulloa proposed a bathroom break, and as the detective was leaving the room, the following exchange took place:

> Torrez: Can I see that report you have there?
> Det. Ulloa: This one here?
> Torrez: Yeah . . .
> Det. Ulloa: Ah, what do you need to see about it?
> Torrez: Just want to see what it says.
> Det. Ulloa: Well I can read it to you.
> Torrez: Alright.
> Det. Ulloa: Actually, um . . .
> Torrez: Can I get a copy of it?
> Det. Ulloa: Um, what do you need a copy for?
> Torrez: Because I want to know what's coming and you know what you guys are going to do and I need to get it to my lawyer.
> Det. Ulloa: Okay, are you requesting a lawyer?
> Torrez: I already have a lawyer.
> Det. Ulloa: Okay, okay.

It is Mr. Torrez's contention that this exchange was him requesting counsel and the interview should have ceased immediately. Mr. Torrez is correct that even after an individual has properly waived his *Miranda* rights, if he later requests counsel then interrogation must cease and he must be provided counsel (in other words, an individual may revoke the waiver). *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). But Mr. Torrez's argument falls short because a request for counsel after waiver of that right must be unambiguous and unequivocal or else the interrogation may continue. *Davis v. United States*, 512 U.S. 452, 459 (1994). It is not enough for the suspect

to make a statement that a reasonable officer *might* construe as invoking the right to counsel—he must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

Mr. Torrez's statement that he wanted to give a copy of the DNA report to his lawyer, and his statement that he "already ha[d] a lawyer" are not unambiguous requests for the presence of counsel during the interrogation. The most reasonable interpretation of the exchange from the Court's viewpoint is that Mr. Torrez wanted to see a copy of the DNA report. When Detective Ulloa pressed him for the reason he needed to see it, Mr. Torrez struggled for a moment to come up with a reason ("Because I want to know what's coming and you know what you guys are going to do . . .") before settling on "I need to get it to my lawyer." Whether the Court's understanding of what happened is accurate or not, Mr. Torrez's statements are not an unambiguous invocation of his *Miranda* rights. Mr. Torrez did not request a lawyer; he requested the DNA report.

The relevant part of *Commonwealth v. Hilliard* is selectively quoted in Mr. Torrez's brief. He is correct that the Supreme Court of Virginia concluded Mr. Hilliard unequivocally invoked his right to counsel by saying "I already have a lawyer." 613 S.E.2d 579, 586 (Va. 2005). But that is not the entirety of the exchange Mr. Torrez quotes. Immediately before saying he already had a lawyer, Mr. Hilliard had asked, "Can I get a lawyer in here?" *Id.* That is an unambiguous request for counsel, much stronger than any part (or the entirety of) Mr. Torrez's exchange with Detective Ulloa.

Mr. Torrez's brief invokes the Sixth Amendment right to counsel as well as the Fifth, but it does not present any arguments under the Sixth Amendment. If Mr. Torrez did intend to argue the Sixth Amendment right to counsel in conjunction with the June 27 and September 8

16

interviews, the Court simply notes the following:

The Sixth Amendment right to counsel is offense-specific. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). During both interviews, Mr. Torrez presumably had counsel in conjunction with the Arlington offenses. But the Arlington offenses were not the subject of the interviews, and adversarial judicial criminal proceedings had not yet been commenced against Mr. Torrez for either the Zion murders or the Snell murder, which were both discussed during the interviews. Therefore Mr. Torrez did not have a Sixth Amendment right to counsel during discussions of the Zion or Snell murders. Mr. Torrez presents a more novel Sixth Amendment argument in a separate motion, and that argument is addressed elsewhere in this opinion.

For these reasons, Mr. Torrez's motion to suppress statements made to officers from the Zion Police Department on June 27 and September 8, 2010 based on violation of his Fifth and Sixth Amendment rights is denied.

### 4. Defendant's Motion to Exclude Extrajudicial Statements Due to Lack of Corpus Delicti

Mr. Torrez moves to exclude statements he made to CI-2 (discussed above) that include confessions to the charged offense, because the "substantial independent evidence" requirement of the *corpus delicti* doctrine has not been satisfied. In the Fourth Circuit, an extrajudicial confession will not be admitted at trial unless there is substantial independent evidence to lay the foundation that an offense has in fact been committed. *United States v. Sapperstein*, 312 F.2d 694, 696-97 (4th Cir. 1963).

It is true that there is considerable disagreement over Ms. Snell's cause of death. The initial autopsy listed the cause of death as "undetermined." The government's pathologist, Dr. Humphrey Germaniuk, later found asphyxiation and probably homicide, but he may have based

part of his report on the transcribed conversations between Mr. Torrez and the jailhouse informant. Because those statements are the very confessions at issue, Mr. Torrez argues that a report based on them cannot serve as extrinsic corroboration.

Regardless of the state of the cause of death analysis, no *corpus delicti* issue exists here. There is ample extrinsic evidence that the charged crime was committed. Ms. Snell's body was discovered shoved into a wall locker in an unnatural position, she suffered from unexplained petechiae, and her head was covered with a pillow case. On her bed sheets, authorities discovered semen from a man who had previously denied knowing her. Valuable items were missing from Ms. Snell's room.

The burden to satisfy *corpus delicti* is relatively low. "Substantial evidence" can be less than a preponderance. The Court is not concerned by the lack of a conclusive autopsy report. Here the physical evidence at the scene strongly suggests that an intentional homicide occurred. Mr. Torrez's motion to exclude extrajudicial confessions under the *corpus delicti* doctrine is denied.

## 5. Defendant's Motion to Exclude Cooperating Witness Testimony

Mr. Torrez has filed a motion to disclose certain details of all contacts between government agents or prosecutors and informants incarcerated with Mr. Torrez. In the alternative, Mr. Torrez requests a reliability hearing for each potential informant/witness before each is allowed to testify before the jury.

Mr. Torrez cites *United States v. Levenite*, 277 F.3d 454 (4th Cir. 2002), for the proposition that the Fourth Circuit has expressed "deep concern" over the use of compensated informant testimony, and that it has been reluctant to admit such testimony. But that case itself

holds that direct payments to a witness, even on an incentive or contingent "bonus" system are acceptable under certain conditions. *Id.* at 462-63.

In Mr. Torrez's case, many of the concerns in *Levenite* are not applicable. The government states unequivocally in its response that none of the government's witnesses have been compensated thus far, nor has it promised to compensate any of them beyond paying travel and per diem expenses for one witness who is no longer incarcerated (and payment for those expenses is not conditioned on the testimony given). Further, the government states it has made clear to all witnesses that it cannot and will not promise them a benefit under Federal Rule of Criminal Procedure Rule 35(b).

Mr. Torrez is correct that courts have sometimes granted reliability hearings before informant witnesses are allowed to testify at trial. In this case, the Court is greatly reassured by the fact that Mr. Torrez's conversations with CI-2 are taped. And those conversations appear to be the vast bulk of the informant evidence the government intends to offer. The existence of recordings makes reliability hearings unnecessary at this point, especially when combined with the government's assurance that nearly all of the details Mr. Torrez might hope to elicit in a reliability hearing (*see* Dkt. No. 208, at 2 for a list) have already been produced or will be produced as *Brady*, *Giglio*, and *Jencks* material.

Because discovery is ongoing, and the Court believes that disclosures by the government will satisfy Mr. Torrez's requests for details of the relationship between informant witnesses and the government, Mr. Torrez's motion is denied without prejudice. If, after receiving the next round of discovery from the government, Mr. Torrez still believes reliability hearings are necessary, then he may renew his motion at that time, and the Court will consider either having reliability hearings or allowing time for voir dire of witnesses prior to their testimony.

## Conclusion

For the reasons stated above, the government is allowed, pursuant to Federal Rule of Evidence 404(b), to present evidence concerning Mr. Torrez's knowledge of figure four and "sleeper" chokeholds, evidence of the Arlington offenses except as noted, and the results of forensic analysis of Mr. Torrez's computer. The government is precluded from presenting evidence related to the 2005 Zion, Illinois murders in its case in chief.

Mr. Torrez's motion to suppress statements to jailhouse informants under the Sixth Amendment is denied, because granting it would require concluding that the Arlington offenses and the charged offense are the "same" for double jeopardy purposes.

Mr. Torrez's motion to suppress statements to law enforcement under the Fifth Amendment is denied because he knowingly and intelligently waived his *Miranda* rights before the interviews in question, and the interviewing stopped immediately after the one and only time he unequivocally invoked his right to counsel.

Mr. Torrez's motion to exclude extrajudicial confessions due to lack of *corpus delicti* is denied because the Court finds ample extrinsic evidence that the crime charged did in fact occur.

Mr. Torrez's motion to exclude cooperating witness testimony, or for a reliability hearing, is denied without prejudice. At this time it appears to the Court that all of the information Mr. Torrez is requesting either has been supplied or will be supplied to Mr. Torrez via discovery. Mr. Torrez may renew his motion at a later date if that is not the case.

January 17, 2013
Alexandria, Virginia

/s/ *[signature]*
Liam O'Grady
United States District Judge