**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**UNITED STATES OF AMERICA**  :
                             :
              **Plaintiff,**  :  Criminal Action
                             :  No. 1:11-cr-115
      **v.**                 :
                             :
**JORGE AVILA TORREZ,**       :  August 19, 2022
                             :  10:00 a.m.
                             :
                             :
              **Defendant.**  :
                             :
............................. :


**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE LIAM O'GRADY,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:        **James L. Trump, Assistant U.S.**
                              **Attorney**
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                              703-299-3700
                              Email: Jim.trump@usdoj.gov

For the Defendant:            **Joanne Marie Heisey, Assistant**
                              **Federal Public Defender**
                              Federal Community Defender for the
                              Eastern District of Pennsylvania
                              601 Walnut Street
                              Suite 545 West
                              Philadelphia, PA 19106
                              215-928-0520
                              Email: Joanne_heisey@fd.org

                              **Brian Lee Mizer, Esq.**
                              Air Force Legal Operations Agency
                              1500 W. Perimeter Road
                              Suite 1100
                              Joint Base Andrews, MD 20762
                              240-612-4773
                              Email: Brian.l.mizer.civ@mail.mil

APPEARANCES:   Cont.

For the Defendant:                **Samuel John Browne Angell,**
                                  **Assistant Federal Public Defender**
                                  Federal Community Defender for the
                                  Eastern District of Pennsylvania
                                  601 Walnut Street
                                  Suite 545 West
                                  Philadelphia, PA 19106
                                  215-928-0520
                                  Email: Samuel.angell@fd.org

                                  **Joan Caroline Robin, Esq.**
                                  Law Office of Joni C. Robin, PLLC
                                  114 N. Alfred Street
                                  Alexandria, VA 22314
                                  703-349-1111
                                  Fax: 703-349-1118
                                  Email: Joni@jonirobinlaw.com

                                  **James W. Hundley, Esq.**
                                  Briglia Hundley PC (Tysons)
                                  1921 Gallows Road
                                  Suite 750
                                  Tysons Corner, VA 22182
                                  703-883-0880
                                  Email: Jhundley@brigliahundley.com

Court Reporter:                   **Scott L. Wallace, RDR, RMR, CRR**
                                  Official Court Reporter
                                  United States District Court
                                  401 Courthouse Square
                                  Alexandria, VA  22314-5798
                                  Office: 703-549-4626
                                  Cell: 202-277-3739
                                  Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**MORNING SESSION, AUGUST 19, 2022**

(9:56 a.m.)

THE COURTROOM CLERK: The Court calls *United States of America versus Jorge Avila Torrez*, Case Number 1:11-cr-115.

May I have appearances, please, first for the government.

MR. TRUMP: Good morning, Your Honor. Jim Trump on behalf of the United States. I apologize, Judge. I had this on my calendar for 10:00, and I was sitting down listening to Judge Ellis downstairs, and thought I had plenty of time. But I apologize.

THE COURT: No. I appreciate it, and no problem. It's just one of those mornings. Good morning.

MS. HEISEY: And good morning, Judge. I'm Joanne Heisey with the Federal Defender's Office for the Eastern District of Virginia representing Mr. Torrez, and with me are my co-counsel Sam Angell and Joan Robin.

THE COURT: All right. Good morning to each of you. Nice to see you here.

MS. ROBIN: Good morning, Your Honor.

MR. HUNDLEY: Good morning, Your Honor. Also on behalf of Mr. Torrez, but I submit in sort of an intermediary capacity to address his motion to represent himself, Jim Hundley.

THE COURT: And, Mr. Hundley, thank you, and good morning to you, and I appreciate you undertaking this assignment.

Good morning, Mr. Torrez.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: You have filed a motion to represent yourself in the ongoing 2255 motion that your counsel has been working on for quite some time. And I was not surprised, but the timing of it I find to be curious in that you've gone through the litigation in Chicago and resolved those matters, and you came back here and the 2255 motion, obviously, is a very important motion.

It's taken counsel quite a bit of time to work on, formulate, in part because it's been difficult because of COVID to get in touch with you and to speak with you and also to obtain the information that counsel believes is necessary to assist you in this 2255 matter. So where are you today, Mr. Torrez, as to whether you still want to represent yourself in the filing of the 2255 petition?

THE DEFENDANT: I want to represent myself, Your Honor. I'm --

THE COURT: I'm sorry. Stop. I can't hear you when you're sitting down like that. If you come to the podium --

THE DEFENDANT: I still would like to represent myself, Your Honor.

THE COURT: What understanding do you have of the requirements for filing a petition under 2255, and have you discussed with counsel what issues that entails?

THE DEFENDANT: Yes, Your Honor.

MS. HEISEY:  I'm sorry, Judge.

THE COURT:  Yes.

MS. HEISEY:  I'm sorry to interrupt you, but if we're going to be discussing the attorney-client relationship and communications, then I would just ask that we do that *ex parte*.

THE COURT:  Yeah.  I agree.  I was wondering how far I could get before I got into the particulars, but you're right. We need to -- I'll ask the government at this stage to leave the proceedings while I do that, and we'll go through the *Faretta* factors with Mr. Torrez.

Is there anything preliminarily that you would like us to discuss now, Mr. Trump?

MR. TRUMP:  Just very briefly, Your Honor.  This is sort of like déjà vu because we had a very, very similar issue come up at trial, and the Court found a way to resolve it in a very similar fashion, by having an independent attorney discuss Mr. Torrez's willingness to represent himself at that time.  He withdrew that request, and new counsel was appointed, and we proceeded in that fashion.

The issue before the Court is simply whether Mr. Torrez wishes to represent himself and is competent to do so.  And the competency standard is one that -- for example, in the *Dylann Roof* case before the 4th Circuit, it was discussed -- it's not the same competency as proceeding to trial, it's whether he has a sufficient understanding of the issues and matters at stake, that

his desire to represent himself should be granted, and he does have that absolute right.

If, however, the Court determines that he's not able to fully understand the nature of the proceedings and proceed as his own counsel, then he does have to accept to a certain extent the strategic decisions of his counsel. He doesn't get to call every shot, so to speak, with respect to legal strategy and how the pleadings and issues are to be addressed. There has to be a healthy attorney-client relationship. It can't all be one-sided, but, at the same time, if he's willing to accept counsel, he also has to be willing to accept the fact that counsel gets to make certain strategic decisions on his behalf. So that's where we are, Judge.

THE COURT: All right. What's your position on whether an examination by a psychiatrist is necessary to support any conclusions the Court makes?

MR. TRUMP: I think that's an issue you can discuss with Mr. Hundley, who is the attorney you appointed, to determine whether in his view that's necessary. I have not seen anything to indicate that another mental health evaluation is necessary, so I can't speak to anything that's happened in the last few months that would change that, but that's why I think the Court can address that issue *ex parte* with Mr. Hundley.

Absent that, it's not necessary that Mr. Torrez has a complete understanding of the law and the Constitutional issues

and ineffective assistance of counsel and all those kinds of things; it's just, is he of sound mind? Is he of adequate intelligence? Can he understand what's at stake? And if he wants to represent himself, he has that absolute right. That's where we are in terms of his jurisprudence. And whether it's a wise decision or unwise decision is not the issue for the Court to decide, it's whether he has a right to do it, and is he prepared to exercise that right.

Regardless of how we end up here, Judge, we also have to decide on the scheduling matters, whether the government would consent to another waiver of the statute of limitations because obviously, whether it's Mr. Torrez or whether it's appointed counsel, there's work to be done, and it probably can't be completed within the timeframe of the most recent acknowledgment by the government to waive any statute of limitations defenses.

THE COURT: All right. All right. Thank you.

MS. HEISEY: Judge, may I just respond very quickly to --

THE COURT: Sure.

MS. HEISEY: -- Mr. Trump's framing of the issue, because I just want to be clear, because the inquiry or the framework that we're operating under is that Mr. Torrez does not have a right to proceed, per se, in habeas.

The Supreme Court has been clear that *Faretta's* right does not extend outside of the trial context, and so for that reason, the way that other district courts have handled these types of

requests in habeas is leaving it up to the Court's discretion, but at the same time it's governed by an interest of justice standard, and our position is that this certainly would not, at this juncture, be in the interest of justice to remove us as counsel handling this very complicated capital habeas matter.  So I just want to set that as the framework that we're operating under.

THE COURT:  Okay.

MR. TRUMP:  Judge, respectfully, I don't think that that is the law.  There was a *mandamus* proceeding -- I don't have the cite off the top of my head -- in another circuit in which the district court refused to acknowledge the defendant's right to represent himself in a capital habeas matter, 2255 matter, and the circuit court disagreed with the district court and actually directed this court to accept the position of the defendant in that regard.

In fact, the right to counsel is diminished in the habeas context.  It's not -- it's a lesser standard, I believe, than -- in terms of trial, but, in any event, I have not uncovered any case that says that Mr. Torrez does not have a right to represent himself, that that right is absolute, and if the Court finds that he is competent to exercise that choice, that is his right.  I think that's where we are.

THE COURT:  Ms. Heisey, do you want to respond?

MS. HEISEY:  Yeah.  Judge, there's certainly no

Constitutional right. That's the holding of *Martinez*. As far as courts finding there, perhaps, being a statutory right -- that might be what Mr. Trump has referred to -- you know, certainly under Section 1654, there's a discussion of parties in federal courts representing themselves, but that's, you know, with the caveat that it's subject to other rules of the Court, and, of course, Section 3599 provides for automatic appointment of counsel in capital habeas proceedings.

That's the default, and that's because of the complex nature of capital habeas proceedings and because, you know, ultimately it supports fundamental fairness in the administration of the death penalty. So that's the related framework that we're operating under. And, again, the way that most of the district courts to address this question have addressed it as being up to the Court's discretion and there not being a right to proceed *pro se*.

THE COURT: Well, doesn't it -- and I read your pleading, and really doesn't it still boil down to the *Faretta* standards and competency and what the defendant's wishes are? And perhaps we delve into the reasons for that and whether they're legitimate or illegitimate and then certainly focus on the -- you know, perhaps not legally required, but I would very much be interested in whether Mr. Torrez has an understanding of what work you have been doing and how it could be continued without you. Those are really the same framework as the *Faretta* standards that I operate

under in a typical district court case.

MS. HEISEY: Sure. Well, I think it's certainly fair for the Court to inquire of Mr. Torrez as to what his reasons are for wanting to proceed *pro se*. I think that's an appropriate inquiry. And then at that point I think Your Honor can determine whether in your discretion it would be in the interest of justice to allow him to proceed pro se given his stated reasons and the juncture that we're in in this case and the complicated nature of the proceedings.

THE COURT: Well, the issue then is -- every judge wants counsel to remain in these cases, whether it's in a 2255 or in a trial setting. The *Faretta* court allowed the defendant to represent himself if he's competent and understands the proceedings and qualifies. So it's not my call, if I make those initial findings, and you believe that in a habeas setting that's not the case?

MS. HEISEY: That's correct. That's very clearly the holding of *Martinez* by the Supreme Court, that *Faretta* does not extend beyond the trial context. That was the case of a direct appeal, and the Supreme Court held that there was no Constitutional right for the petitioner to represent himself on appeal. And the holding again was generally that *Faretta* is limited to the trial context.

THE COURT: All right. Thank you. Clearly, I need to look into this further. Mr. Trump.

MR. TRUMP:  I will be outside, Judge.

THE COURT:  All right.  Thank you.  And I'm not sure who else is present in the courtroom, but we're going to seal up the courtroom at this time.

* * * * * *

(Following further proceedings sealed by order of the Court but unsealed for purposes of transcript production.)

* * * * * *

THE COURT:  All right.  Mr. Torrez, why don't you come back to the podium.  Tell me why you want to represent yourself.

THE DEFENDANT:  There are a number of issues, Your Honor. I disagree with the attorneys.  The way they've handled the cases, things that they should be doing that they're not doing. I mean, yes, I understand that they've been working on a lot of different things, but a lot of that stuff has come from me pointing stuff out to them and showing them and making them do things because they wouldn't do certain things.

Like, they were interested in the mitigation part of my case, and I told them before, Why don't you get my yearbook so I can tell you people I knew when I was younger in high school and all that stuff?  It took them months, and they didn't do it until I brought it up again.  I said, Where are the damn yearbooks? They finally did it recently because they knew I was about to fire them because of other issues that I had with them.

So I do understand that there's a lot involved in my case,

Your Honor, dealing with, like the trial, the -- the trial lawyers said certain things in court that they didn't back it up with evidence that we had. I understand those issues, Your Honor, like the shoe print evidence and all that other stuff as well.

THE COURT: So you're dissatisfied with the timing of when your counsel has addressed certain issues?

THE DEFENDANT: I mean --

THE COURT: But you do realize how difficult it is during COVID to --

THE DEFENDANT: -- yes, Your Honor --

THE COURT: -- handle litigation, and, you know, be able to visit you or contact you where you are.

THE DEFENDANT: Contacts haven't been an issue, Your Honor. As a matter of fact, there was one visit that lasted about four hours, and maybe ten minutes of that we talked about my case. The other stuff was just small talk, all that other stuff, Kardashians, aliens, all different type of stuff, so what's the point of that visit?

THE COURT: Well, they're trying to get to know you a little better and understand you.

THE DEFENDANT: Well, I've already been talking to them for years already, Your Honor. What else is there to know -- to get to know about me?

THE COURT: All right. Well, what would be the plan

moving forward then?

THE DEFENDANT: I would represent myself, Your Honor. I wrote down a couple of different issues of why I want to represent myself, stuff that's gone on in the past. I don't know whether or not you would be interested. I didn't have a dictionary, so there's a lot of misspelled words in here, more than likely.

THE COURT: I'm happy to receive it if you've given a -- Has Ms. Heisey had a chance to look at it or Mr. Hundley?

THE DEFENDANT: Due to my situation right now in Alexandria, they got me on quarantine. They won't let me go to the law library and make copies or anything, so that's the only copy I have, Your Honor. I was trying to make a copy and let them know, but they're not cooperating with me over there at the jail.

THE COURT: Well, if that's your reasons for why you want to represent yourself, then I certainly need to see it.

THE DEFENDANT: I mean, I have more stuff that I wanted to introduce as evidence and stuff, but in my transition to come here, none of my property came with me, so all of that is still at Red Onion. Like, a lot of these points I have in evidence to show you to prove what I'm showing in all this stuff, but, due to circumstances, I don't have that with me, Your Honor.

THE COURT: All right. Well, let me see what you've got.

THE DEFENDANT: This one right here is in response to the

paperwork that I got yesterday from Mr. Hundley, just some questions and stuff that I wrote down in there.

THE COURT: Have a seat and let me take this and read all this.

THE DEFENDANT: Yes, Your Honor.

(Brief pause in proceedings.)

THE COURT: I've reviewed Mr. Torrez's letters to me and also his response to the warden or Jeffrey Krueger's memorandum, and in it Mr. Torrez speaks of difficulty in getting counsel to do things in a timely fashion and to provide him, for instance, with an MRI, although he then got it, and then any expert reports that I gather he still has not received, and getting from counsel about what the MRI means; also an interest in contacting old community members who were friends and being told not to, which, of course, is so that those individuals could testify without having recently spoken to you and been influenced in what they would say. So there's very good cause for that.

And, Mr. Torrez, when you say "counsel," are you referring to -- is it Ms. Heisey that you deal with on a regular basis? Have you spoken to Ms. Robin? Who do you consider to be your counsel that you're communicating with?

THE DEFENDANT: It depends, because -- I've talked to different -- a lot of attorneys that are on my team, Your Honor. I talk to each one of them about different things. Sometimes I do tell them to share it with other attorneys, so at some point I

don't know what attorney is working on what.

THE COURT:  Okay.

THE DEFENDANT:  So, like I said, it would depend on the issue of what you're talking about, Your Honor.

THE COURT:  So, I appointed Ms. Robin, who is seated at the second table to represent you.  She's from the Eastern District of Virginia here.  And then the Federal Community Defenders of the Eastern District of Pennsylvania entered their appearance, and Ms. Heisey and Sam Angell are counsel for you from that office, and there are others as well; is that correct?

THE DEFENDANT:  Yes.  There's Katherine and two different Claudias, and then you have the investigators, Rachel and Quentin, I believe.

THE COURT:  Okay.  And is there any particular person that you have a difficult time with or is it in general that you're dissatisfied?

THE DEFENDANT:  I'm just dissatisfied in general, Your Honor.  I mean, there is -- one of the Claudias clearly doesn't understand what I tell her.  I mean, I sent her a letter in black and white of what I wanted her to do, and she told me she would take responsibility and do it -- and this was an ongoing issue at the time -- I've been waiting for it to be done.  It hadn't been done yet, so I let her know I was frustrated with that.  And when she told me she was going to do it and she was going to tell me the e-mail results for the e-mail she was going to send next

week, two weeks later I find out that she still hasn't done it after she told me she was going to. And then, after she didn't do it, she sent it to the wrong person, and then she put stuff on there that I didn't even tell her to put on there, which makes it seem what I said was wrong. Like, I believe that -- she said I had asked for my glasses or whatever for my property that was taken at the prison. I don't even wear glasses, Your Honor, so why would they put that in there like I'm requesting glasses that I don't even own or don't use? So, if they don't understand me in person or in black and white, how are they going to understand me when it comes to this case that's complicated?

THE COURT: Yeah. The issue of suing the jail or the BOP --

THE DEFENDANT: That would be a separate issue, but --

THE COURT: It is in there, and they don't represent you on that, and you're not entitled to counsel for those types of actions. So they're -- you know, they can try and find an attorney who would represent you.

THE DEFENDANT: They failed at that, too, Your Honor. I asked them to find me an attorney that can, that is able to file a lawsuit. They gave me George Cruz's name. I've already talked to him. He's investigating the conditions at the prison, but he's not going to file a lawsuit.

THE COURT: Well, that's not their job. Their job --

THE DEFENDANT: I understand that, Your Honor.

THE COURT: -- is to file the petition.

THE DEFENDANT: They're the experts. It should be simple to find stuff like that, but the way I see it, if they couldn't do simple things, I don't trust them to do more complicated things.

THE COURT: What is the -- why do you have a belief that they have some agreement with Terre Haute not to --

THE DEFENDANT: They told me themselves, Your Honor. They told me they are unable to sue the prison legally for whatever agreement that they made with the prison or contract that they have. I'm not sure. But they did tell me that they can't do that, Your Honor.

THE COURT: And you think that they represent dozens of inmates at that facility?

THE DEFENDANT: They have to represent -- their law firm represents at least about a third of them over there, Your Honor.

THE COURT: And what makes you believe that?

THE DEFENDANT: I've asked around. Other inmates have the same law firm from Philadelphia. I've even had the attorneys tell me, yeah, they have multiple clients at that facility.

THE COURT: Okay. Well, why does that bother you?

THE DEFENDANT: It doesn't, but that gives them a higher case load, Your Honor. They've got lots of cases they've got to work on besides mine. And if I represent myself, I can focus all my time on my case because it's the only one I have. Their time

is going to be split and divided.

THE COURT: Yeah, but they have the expertise in death penalty petitions, which is a very focused and sophisticated and complex area of the law. And I'm sure they represent more than one inmate who's received a death penalty, but their experience in those is really important, and so they're going to have more than one person situated like you, but they've got a big office, and they represent a lot of people just like the Public Defenders do here in the Eastern District of Virginia, and that's why they have the numbers of assistant public defenders that they have, so that they can still render competent representation.

So the number of people that they represent shouldn't be a problem for you. Your focus should be on the representation that you're receiving, and I know that you're explaining some of the reasons why you don't think that's been sufficient for you to have confidence in them, but going back to my questions I was about to ask earlier, have you reviewed any drafts of a pleading that they are preparing to file or an outline? Do you have an understanding of what issues they're investigating in support of the petition?

THE DEFENDANT: Some of them, Your Honor, yes. But, like I said, I did have a copy of one of the briefs that they had given me before, but, like I said, during transition over here I don't have it so I can't go through it to find the issues and stuff, Your Honor.

THE COURT: All right.

THE DEFENDANT: Like I said, I know some of them had to deal with, like, mitigation, but there's just really nothing there that they have found that -- the only thing they told me is that they found out that I'm dyslexic, and I don't see how that's a help.

THE COURT: Well, not standing alone, it's not a help, but they're, I'm sure, investigating your overall mental health.

THE DEFENDANT: I know that they have been looking for stuff that makes me an at risk factor from when I was young, something that traumatized me, something that affected me or whatever. It's not in my past. It didn't happen. And the only thing that they found is some expert witness that they hired or whatever to review the MRI scans that I had. They told me that he had said that either part of my brain is either too big or too small, but when I asked them what part of the brain it was, they couldn't really tell me. And I said, Was it too big or too small? They couldn't answer that. So what expert are they talking to? Because, I mean, if I had Internet access, I could find out the size of the brain and all that stuff on the Internet, what's the average and everything for a male of my age?

So for them not to be able to do that with an expert, I don't understand that, Your Honor. Because they told me the expert needed a functional MRI scan or something like that, that the one that I got done was only a standard, it wasn't the

functional. So I told them to set up the other one to find out for certain whether it's true or not. That hasn't been done. That would be hard evidence, Your Honor, that could help me out that they haven't done.

THE COURT: Well, are you capable of doing that yourself? I mean, communicating with the expert, arranging for an additional MRI? Is that something that you believe that you could do?

THE DEFENDANT: I mean, if I could do the research on it, yes, Your Honor, I believe I could do it.

THE COURT: What have you been doing for the last several years as far as helping yourself for your mental health?

THE DEFENDANT: I mean, it varies. Sometimes I read a lot of books. I've got different topics I like to read about, animals, science. I get art books sometimes, fantasy, science fiction. Sometimes I draw. Sometimes I paint, whenever the materials are given to us at the prison. I write letters. I try to get pen pals whenever I can.

THE COURT: Have you had any mental health issues while you've been in custody?

THE DEFENDANT: No, Your Honor.

THE COURT: You haven't had any evaluations done by the Bureau of Prisons because they believe there's -- or any of the state facilities because they believe you have a mental health problem?

THE DEFENDANT: No, Your Honor, but everybody has always believed that I had mental health problems, but nobody has ever been able to find anything definitive that says that I actually do, but I don't. Like, I just went through a mental health screening at Alexandria, but that's just because I showed up. That's what they do with everybody at intake. That's the only stuff I had done like that.

THE COURT: Okay.

THE DEFENDANT: I know at some points I've protested the conditions and stuff at the jails, at the prison with hunger strikes, but that has nothing to do with my mental capabilities or nothing, Your Honor.

THE COURT: Why did you do that?

THE DEFENDANT: Different reasons.

THE COURT: Just to do with how the jail was treating you?

THE DEFENDANT: Yes, Your Honor. Like, I just came off of one in Alexandria because they had me in a cell with a busted sink for three days. The cell was dirty. I was constantly telling the COs to let me out or give me some cleaning supplies to clean it or move me in a cell where the sink works, but they weren't listening to me, and that's why I started it. But luckily a sergeant that I knew from before came by, and I told him the issue and he was able to put me in a new cell, so that resolved it. I'm already off of that one, Your Honor.

THE COURT: Okay.

THE DEFENDANT: Like I said, I've been there for five days. I haven't had rec once, and I've only had a shower once since Monday.

THE COURT: Yeah. Well, I don't want you to stay there any longer than you have to because being a temporary resident there, you wind up in, really, solitary confinement.

THE DEFENDANT: That's what they have me on already. They're saying because of my charge they're going to put me on administrative segregation. That's what they had me on last time. They never gave me a chance to go to population.

Right before I went to Alexandria, I went to Northern Neck Regional Jail. I had a cellmate for two weeks, and I was in population for two weeks in a unit with 24 other inmates. I had no problems, Your Honor.

THE COURT: Okay. And what's -- and your facilities at Red Onion and Terre Haut, where are you? Are you at Red Onion now?

THE DEFENDANT: I came from Terre Haut, Your Honor, yes. That's where -- federal death row is housed over there.

THE COURT: Right. And that's where you'll go back?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And do you have access to a law library there and Internet access so you can do research?

THE DEFENDANT: We have law library access but no Internet access, Your Honor.

THE COURT: All right.

THE DEFENDANT: That's what I'm saying. If I had Internet access, I think I could do sometimes a better job than attorneys can in researching certain things, but, being a prisoner, I don't have Internet access, Your Honor.

THE COURT: Then how are you going to file a substantive 2255?

THE DEFENDANT: The best I can with the resources that I have at the prison, Your Honor, the law library, the almanac, and all the other stuff that I have.

THE COURT: Yeah, but your capabilities are so limited, you know. Why can't you work out some hybrid relationship with your counsel so that they could be supporting your efforts, and that you, perhaps, could have the final say in what went into any petition at the end of the day?

THE DEFENDANT: That's just something I don't want to do, Your Honor. I would rather just go at it alone by myself, if I have to.

THE COURT: Well, you added some probability of success in the petition that is very low, but you feel that you may at the end of the day have a better chance yourself than the statistics?

THE DEFENDANT: Am I wrong on that, Your Honor?

THE COURT: Statistics tell part of the story, but they don't identify unique legal issues which may take you outside of the statistics. Those statistics exist because there are

successes in 2255 petitions in death penalty cases, but, you know, identifying what is going to be important to overturning a death penalty is not something that many people understand. It takes a real sophisticated knowledge of death penalty law, which is changing, you know, all the time, and, you know, is really not the kind of research that you can do in books at the library because the latest work that's being done is important to the petition. So that's what I'm struggling with, is -- I know you --

THE DEFENDANT: It's an uphill battle no matter which way you look at it, Your Honor. I'm what you would call a layman or whatever. I'm going up against experts. They've been doing this for decades or longer.

THE COURT: I know you're in kind of an adversarial posture right now with your counsel, but they're there to help you. They're not there as adversaries. They may tell you this works and this doesn't work, and you may not agree with them, and so you're a little bit on an edge when that occurs, or they're not doing things at the same time that you want things done, and you're sitting in a jail cell getting frustrated, but that doesn't mean they're not working on your behalf. It means that they're getting things done in their practice the best that they can, and I guarantee you they're working hard on representing the --

THE DEFENDANT: I don't view it that way, Your Honor.

Because, like I said with the yearbooks, COVID had nothing to do with that. All they had to do was pay the company. The company would have sent the books out. That doesn't take that long, Your Honor, and it took them a year, if not longer to do that.

THE COURT: Yeah.

THE DEFENDANT: I mean, COVID is no excuse for that.

THE COURT: No, that's not -- well, I don't know whether it is or isn't, but, you know, I don't know how you're going to be able to file a substantive petition without some help, and your answers to that are, you know, I'll do my best in the law library, but --

THE DEFENDANT: I can look up the case law, Your Honor, depending on the issue, introduction of evidence or whatever. I can look it up at the law library to find out what the issue is under --

THE COURT: All right. Have a seat for a minute. Mr. Hundley.

MR. HUNDLEY: Yes, Your Honor.

THE COURT: Thank you for accepting the appointment to counsel Mr. Torrez about his request to represent himself. Have you had the opportunity to speak with him about that?

MR. HUNDLEY: I did, Your Honor. I spoke to him on the telephone while he was at Terre Haute twice. The -- I guess I'm concerned about the attorney-client privilege, so I want to be careful how it's -- it's not really clear what's been waived and

what hasn't been waived, but I think I can say without getting into that issue that the first conversation was lengthy and quite substantial, and I was interested in, first of all, just trying to ascertain if, perhaps, he was suffering from a mental illness that would impact his competency.

After that initial phone call, I felt that he was oriented and was responding appropriately to my questions, although I did have some concern about his level of anxiety and his level of mistrust and the extent to which he would tend to focus on issues which I saw as either very collateral or irrelevant to the 2255 petition.

But I attempted to follow up with him during my second phone call, and at that point I became more concerned about his mental condition. He had quickly become very distrustful of me, as well as all of his other attorneys, and it culminated in the letter that Your Honor received from him, the most recent letter, in which he expresses his belief that I don't represent him, that I'm not serving his best interests, that the community defenders are -- somehow have an agreement with the Bureau of Prisons, which is a conflict for them to represent him.

There just appeared to be a very high degree of anxiety, mistrust. He's not hallucinatory or any of those things, and I'm not enough of an expert to say, well, is he paranoid? I don't know. But given that he's been on death row for many years, certainly mental health issues could have arisen since his last

competency evaluation.

And so I think the interest of justice would be served by another evaluation at this point to see if he is suffering from any kind of mental health issue which the Court may need to consider, which I think is the first question that the Court has to address, setting aside whether or not it's a Constitutional right or an absolute right or a question for the discretion of the Court. I think the question of whether or not he's suffering from a mental illness that would somehow impact his ability to represent himself and understand the issues, that threshold question needs to be addressed, and I would think that a competency evaluation would be appropriate.

I have told him that I believe it's in his best legal interest to continue with his current attorneys representing him. As he told you in his letter, he thinks that -- he doesn't accept that advice and believes it really disqualifies me as serving as his attorney, but I firmly believe, as an attorney, he needs to be loyal 100 percent to his legal interest, and his legal interests are best served by delaying or preventing the execution of the sentence that has been handed down in this case. He may or may not agree with that, but I think that's a true and correct statement of the law in this case.

So at this point -- I attempted to see him once he was in Alexandria, and he's refusing to see me at this point. So, again, that just heightens my concern about whether or not he

does have the ability to represent himself in this case and really understands the circumstances and the impact that they will have -- the importance of a habeas petition in this case and the impact that it's going to have on him and his future.

THE COURT:  All right.  Thank you.  Let me have Ms. Heisey speak now, and then I'll hear from you again, Mr. Torrez.

MS. HEISEY:  Your Honor, I'm happy to answer any questions you may have about the issues that Mr. Torrez raised in his submission to the Court, but just to give some more general background on the attorney-client relationship here, you know. Our vantage is that we have had a positive working relationship with Mr. Torrez up until very recently and have had regular communication and visitation with him.

Our view is that the current breakdown is really stemming from Mr. Torrez's frustrations with his conditions of confinement.  You know, earlier this year he went on a hunger strike in protest of some of the condition issues that he was having with the prison.

As part of prison policy, he was placed in isolation for for observation for an extended period of time while he was on that hunger strike, and that was obviously very distressing, and that's the time period during which this breakdown sort of arose.

And we obviously, you know, appreciate Mr. Torrez's frustrations with his conditions and have attempted to advocate for him to some extent with staff at the prison, but, as I'm sure

Your Honor understands, we're really limited in what we're able to do as being outside of the scope of our representation.

THE COURT: Two immediate questions. One is, who is Claudia? Is she one of the lawyers on the team that was unresponsive or a paralegal? And second is, do you have some agreement with the Terre Haute Bureau of Prisons that you won't engage in any active litigation against them under any circumstances?

MS. HEISEY: No, Your Honor. Well, to answer your first question, Claudia -- I believe what Mr. Torrez was referring to was an attorney who was on the case. She's no longer with the office, but I believe that's whom he was referring to as to a miscommunication as to him, you know, asking her to navigate some requests with prison staff at Terre Haute as to issues he was having there.

And then as to our having any kind of agreement with Terre Haute or with the BOP, I'm really not sure what Mr. Torrez is referring to or where that misunderstanding is coming from because we certainly don't have any sort of agreement of that nature in place.

THE COURT: How many inmates at Terre Haut do you represent?

MS. HEISEY: That's a good question, Judge. Off the top of my head, I would say maybe in the ballpark of 10 or so. That's just an estimate.

THE COURT: And do you feel that your office is staffing each of those cases properly and that you're not stressed too thin based on the size of the office and the type of litigation that's needed?

MS. HEISEY: Yes, Your Honor. Mr. Torrez's case is well-staffed. All of our cases are well-staffed. We're the largest capital habeas unit in the country, and, in fact, our office received a grant to expand about 15 years ago or so specifically for the purpose of taking on more 2255 cases. So that's a specialty of our office.

THE COURT: And do you have any understanding of the capabilities -- I guess the -- what type of library Terre Haut has for inmates doing research? Do you --

MS. HEISEY: I don't, Your Honor. But, again, this -- as Your Honor knows, this -- the nature of this type of litigation is extremely complex, and I would be very concerned with Mr. Torrez's competency and ability to be able to handle capital habeas litigation.

THE COURT: Where are you in the -- the case has been going on a long time, and you've been representing him in this petition for quite a while. Where are you in completing the petition, and what could you provide to Mr. Torrez that would help him if the Court decides -- if I decide that he should be allowed to represent himself?

MS. HEISEY: Sure. So, I think it's fair to say that our

investigation is near being complete.

As we mentioned in the filing that we made back, I think, in April in response to the Court's order, we had mentioned that the sort of main outstanding piece of the investigation that we hadn't been able to complete yet was a trip to -- an investigative trip to Mexico, which is where Mr. Torrez's family is from. So that trip is actually taking place this week. We finally have been able to go ahead with that. So I think at this point it sort of just remains to be seen what, if any, follow-up will be needed after that trip, but I think it's fair to say that we're nearing wrapping up the investigation.

You know, as far as sharing where we are with Mr. Torrez, we have, as we've gone along, been keeping him apprised of what our different experts are working on and what their findings have been. You know, some reports are still outstanding, and I would say even generally we generally don't disseminate reports before they've actually been filed because of the sensitive and confidential nature, but we have discussed and kept him apprised of, you know, what they've been doing and what their findings are.

THE COURT: Okay. All right. Thank you. Mr. Torrez, do you want to be heard? Go ahead.

THE DEFENDANT: As Mr. Hundley was saying, I welcome a competency hearing, Your Honor. You've given me one before. I passed it. I have no doubt I'll pass it again. I don't suffer

from paranoia. I don't have a pen, nothing to take notes with as they talked to bring up issues that they brought up, but for the Constitutional right, they're saying I don't have a right to self-representation, right? Well, where in the Constitution does it say I must have reputation for the capital habeas?

THE COURT: You have a right to represent yourself, and --

THE DEFENDANT: -- because from my understanding --

THE COURT: -- and I have greater discretion in how I respond to your request at the district court level when we went back and forth. But, ultimately, you have a Constitutional right to represent yourself, and I'm going to order that you receive a competency hearing. I want to make sure that the underlying last several years with the hunger strikes and the anxiety that you're now demonstrating towards your counsel isn't coming from some other mental health or --

THE DEFENDANT: It's not, Your Honor. One of the issues -- when I went on the hunger strike at Terre Haute, the policy -- the policy -- I sent it to them -- it clearly states that they're only supposed to take my food items and move me to a new cell that has a camera in it for observation. That part is correct. But what they didn't tell you is the prison also took all my legal documents and my envelopes and my stamps, so I could not even contact the court or them.

And I managed to let them know, and they weren't even doing anything about that, basically, helping me to get access to

the courts. So I took myself off of the hunger strike to get my property back to write you, and that's basically when I decided I was going to get rid of them because they are of no help to me. If they can't help me with access to the Court, what can they help me with, Your Honor?

THE COURT: And nothing that we've discussed here this morning has changed your mind about that, the sophistication of the pleadings necessary, the number of experts, the work that they've already done?

MS. HEISEY: I mean, they have had a number of experts. One was like a therapist or a psychiatrist or whatever. She asked me a bunch of questions. I answered them, and then she tried to say that something happened to me to traumatize me at childhood, but I found out the test was flawed.

Like, if I were to ask somebody, what's your name -- or your mother's maiden name, social security and date of birth, they wouldn't give it to me because they know I could steal their identity. But because I answered some questions like that, she makes an assumption off of the answers that I made. So, like, somebody who has not had their identity stolen, if I asked them for their social security or date of birth, they're not going to give it to me, but the way they do that test, I can say, oh, you've had your identity stolen, even though they haven't, Your Honor.

THE COURT: But, you know, that's what experts do; they

make assumptions based on testing that has been developed over years before. So --

THE DEFENDANT: Yeah, but out of all the experts they've gotten, they have nothing useful to show, Your Honor.

THE COURT: Okay. All right. Well, that was Dr. Ratner who evaluated you previously, I believe.

THE DEFENDANT: I can't remember the name.

THE COURT: Do you have any objection to that same person --

THE DEFENDANT: -- no, Your Honor --

THE COURT: -- interviewing you again?

THE DEFENDANT: I do not, Your Honor.

THE COURT: All right.

THE DEFENDANT: As I say, I welcome it.

THE COURT: Okay. Then I think that's the first step, is to make sure that your mental health is not a question, and then we'll get to the issue of representation after I've received his report. Hopefully, we can get to him in the next couple of weeks or -- we'll get to him today, but hopefully we can get him to see you in the next couple of weeks. And, you know, it's going to be difficult for him to get down to the Northern Neck when he lives up here in Northern Virginia.

THE DEFENDANT: I'm in Alexandria right now, Your Honor.

THE COURT: I know, and I'm just saying I'm going to have to keep you there in Alexandria, and I'll check with the jail to

see whether they can get you into the general population.

THE DEFENDANT:  I mean, I've looked into the issue in the past, and I've gotten different answers.  The jail tells me it's coming from the marshals, that they're putting me in all this extra heightened security, that's why they can't put me in population; they say it's because of my charge or whatever.

THE COURT:  Yeah.

THE DEFENDANT:  I've asked the marshals before, the last time I was here in 2014, and they told me they have nothing to do with the jail, that the jail does it on their own.  So who's telling me the truth and who's lying or what the true issue is, I don't know.

THE COURT:  Okay.  Well, I'll see if I can get you in the general population, but I don't guarantee that you won't remain in segregation.  We'll see what better conditions we can get for you.

THE DEFENDANT:  Right now they have me in booking.  I'm not even in a regular unit or nothing, so I can't even get access to the phones barely right now.

THE COURT:  Okay.

THE DEFENDANT:  Like I said, I can't do any legal research because they won't let me go to the library.

THE COURT:  Right.  That's probably not going to happen for the next -- a short period of time while you're staying here in Alexandria or maybe not in Northern Neck either, but let's get

to step 1, which is to get you examined. I hope I'll be able to arrange for that in the next couple of weeks, and then we'll come back and have a subsequent hearing, and I'll check with counsel to see their availability and hopefully either in late August or early September.

THE DEFENDANT: Before I leave, Your Honor, could I get your name and the address to the Court so I can write you from the jail? Because I don't have any of my information that I had before due to being transferred.

THE COURT: Sure. It's --

THE DEFENDANT: Do you have a card?

THE COURT SECURITY OFFICER: Yeah.

THE DEFENDANT: Like I said, with the transition, Your Honor, I can't really present all the stuff that I wanted to present and stuff like that, so --

THE COURT: Okay. So we're going to keep him in Alexandria until further notice, and if you need me to issue an order to that effect, let me know, but I don't want him moved back down to the Northern Neck because it would be too difficult for a psychiatrist to see him.

THE DEFENDANT: Yeah, Northern Neck is a whole 'nother world down there because down there you have to buy your shower shoes and toilet paper and everything. They don't even give it to you, Your Honor. So it's -- I mean, it's a plus that they had me in population down there, but then the cost of living over

there is a lot more expensive, and I'm indigent right now.  So -- so the $5 I had over there hasn't even been transferred.  They're telling me it's not even going to follow me.  It will probably go back to the Feds, but what good is it doing with the Feds if I'm here?

THE COURT:  Not much.  All right.  Does anybody have any final comments?

MS. HEISEY:  Can I say one last thing, Your Honor?

THE DEFENDANT:  Yes.

MS. HEISEY:  We're certainly in agreement that if Mr. Torrez is being allowed to proceed *pro se*, that there would certainly need to be a competency inquiry before that happens.  I just want to reiterate that I don't think it's necessary at this juncture because, as I said, Mr. Torrez doesn't have a right to proceed pro se, and it is up to Your Honor's discretion, and that can be the end of the inquiry, and it's subject to an interest of justice standard.  Our position is that it would certainly be counter to the interest of justice to remove us as counsel in such a complicated proceeding as this.

THE COURT:  Yeah.  All right.  I understand your position, and -- but I still think that the competency hearing is appropriate.

THE DEFENDANT:  I mean, Your Honor, what's the worst that could happen?  I've already been sentenced to die.  I understand that.  The papers that I sent you -- I mean, if I represent

myself, the worst case scenario, I lose, I drop the ball or whatever, I'm already sentenced to die, Your Honor. I mean, what's the worst that could happen?

THE COURT: Well, when you -- well, when we were at the trial level and you said you wanted to represent yourself and you didn't want any mitigation evidence to be put forth and that you would rather die than spend the rest of your life in prison, I said to you then, I said, Well, I understand that that's what your position is today, but what about five years from now? And you said it's not going to change.

THE DEFENDANT: Is the habeas procedure even mandatory, Your Honor?

THE COURT: No, it's not mandatory.

THE DEFENDANT: So, if I wanted to drop it and get it over with, I could, right? I don't need attorneys for that. I could make that decision myself.

THE COURT: Well, the reason why the Defender's Office in the Eastern District of Virginia represents so many inmates on death row is that the belief is that you really don't fully understand what that means.

THE DEFENDANT: That means I'm executed, I die by lethal injection.

THE COURT: Well, the administration of justice for everyone, not just you with this personal view, should reflect that inmates who are actually executed don't have a legal right

to have the death penalty removed by the Court for some legal reason, and that nobody should be executed if it's not the right sentence. And so even though you may personally think, I'm done with this, I just want to move forward with the execution, our society really mandates that that would be unjust and that people should not be executed, whether they want to be or not, until all their legal rights have been resolved.

THE DEFENDANT: If it's not mandatory, Your Honor, then what's the point?

THE COURT: Well, that's what our society mandates.

THE DEFENDANT: That's the justice, though. I've been sentenced to die. Justice has to be carried out at some point.

THE COURT: Yeah, well, we're going to explore this a little further. So, as soon as I can have an idea of when the counselor, the psychiatrist can get to you, I can get with counsel and arrange a subsequent hearing. We'll come back and talk about it some more. In the meantime, if you would like to, and I'm happy to respond.

THE DEFENDANT: Yeah. And, as Mr. Hundley said earlier when I did talk to him, I told him my interest in court was to represent myself, to move on, to get rid of the public defenders that I have right now. And in my second conversation with him, he told me that everything that I told him he wouldn't discuss with them, and he told them giving them a chance to better prepare themselves to stay on my case instead of me getting rid

of them.  That's contrary to what I wanted.  So that's why I cut off communications with him, because he's working with them.  He's now one of them.  It has nothing to do with my mental capability, Your Honor.  That's just the way I view it.  He's either with me or against me, and he's against me.  He wants different outcomes.

THE COURT:  Well, he was asked by me to speak with you.

THE DEFENDANT:  I understand that, Your Honor.

THE COURT:  And to determine whether he felt you were competent, and that was his sole role in your representation.  And in trying to make that determination, of course he has to speak to your counsel and ask them about the history of their relationship to see whether there's anything that he should be focused on.

THE DEFENDANT:  I understand that, Your Honor, but speaking with him, he directly told me that everything that I told him, all the issues that I brought up, he brought up to the public defenders.  I mean, that right there is like you're basically giving my case away.  It's like if he was talking to the prosecutors and he told them what all my defenses were.  That's the way I view it because that's what I did.

THE COURT:  All right.  I want you to keep thinking about this because, as I said a few moments ago, this is not an adversarial process here.  Your attorneys are trying to help you.  They're very well-qualified to do so.

THE DEFENDANT:  But if what I want goes against what they want, ethically and morally I want to drop the appeal, they want to keep the appeal going, we're at odds.

THE COURT:  All right.  You keep thinking about it.  I'll get you that examination as soon as I can and we'll reconvene.  All right, sir?

Let me have Mr. Trump come back in just so I can tell him where we're going schedule-wise.

MR. ANGELL:  Sam Angell on behalf of Mr. Torrez.  Can we get an order from the Court for the BOP records for Mr. Torrez, please?  We've been requesting them for quite a while now and have not received them.  There was an incident which we would like to look into back in May of 2021.

We were -- Mr. Torrez was hospitalized and had a fall, and I think that would be relevant, and we would like to have all of the BOP records on that --

THE COURT:  From Terre Haute or --

MR. ANGELL:  Terre Haute, yeah.

THE COURT:  Okay.

MR. ANGELL:  So, we could submit a motion to Your Honor for that.

THE COURT:  I was just going to ask you to do so, and I'm happy to order that.

MR. ANGELL:  Secondly, I'm wondering whether it would be appropriate for the Court to order a defense psychiatrist also to

examine Mr. Torrez.  An issue like that came up at the previous hearing on this type of issue where Your Honor asked Mr. Kamens, who was trial attorney at the time, do you have anything to rebut what Mr. Ratner is saying, and he said, No, I don't.  So I think, given the seriousness of this situation, it would be appropriate for another psychiatrist to evaluate Mr. Torrez as well as Dr. Ratner, if Dr. Ratner is available, and we would like to pursue that, and Your Honor has the discretion to permit that.

THE COURT:  Yeah.  I don't see an immediate need for that. If you want to file a motion, I'll certainly consider it, but I'm not going to order that independently.  I think that -- I see Dr. Ratner, whoever examines him, as having a narrow scope of the examination, and he's fully competent to do that.

MR. ANGELL:  Thank you, Your Honor.  And finally, would Your Honor be providing us copies of the correspondence that Mr. Torrez sent you?

THE COURT:  Yes, yes, we will do so.

MS. HEISEY:  Thank you.

THE COURT:  So, Mr. Torrez, so you know that anything that you file in court or anything that you send to me, I'm going to send to counsel, okay?

THE DEFENDANT:  Yes, Your Honor.  That's public knowledge. I'm aware of that.

THE COURT:  All right.  I think I put that in some prior correspondence to you.

* * * * *

(Previously designated sealed proceedings concluded and the following further proceedings were held in open court:)

* * * * *

THE COURT: Mr. Trump, I think we've had a pretty full discussion of the issues surrounding why we're here today. I have not made any decisions, other than to have Mr. Torrez examined by a court-appointed psychiatrist as to his competency to make the decision as to whether he wants to represent himself or not.

And so Dr. Ratner did the previous examination. I think he's still in practice, and we'll get in touch with him right away to see how soon he can get over to the Alexandria Jail. Mr. Torrez will remain in Alexandria during the pendency of our hearings, and we'll reach out to counsel as soon as we know Dr. Ratner's schedule and when we will get a report from him and resume this hearing. So that's where we are.

MR. TRUMP: Your Honor, just so I can clarify my previous comments, I think the Court noted that we all prefer dealing with counsel. It's always a more difficult proceeding when it's a *pro se* defendant. The *Wills* case, for example, was one in which Mr. Wills represented himself with standby counsel. It was a capital case and obviously at every turn the issues become more

complex and more difficult with *pro se* representation, and so I don't want my comments to reflect an opinion as to whether we prefer one result over another, but the case I was referring to before was a 5th Circuit case, *United States versus Davis*. It was decided by the 5th Circuit on October 28th, 2015. It's an unpublished decision in which on *mandamus* the Court had to wrestle with whether the district court had appropriately denied the defendant's request to proceed *pro se* in the context of the 2255 proceeding. The Court -- the 5th Circuit decided that there was a statutory right to proceed *pro se*, the statutory right having existed for 200 years under Section 1648 U.S.C. 1654.

The Court said it did not have to reach the Constitutional issue of whether the *Faretta* analysis would apply because the statute gives litigants the right to proceed *pro se*.

One of the underlying rationales is that, yes, *Faretta* was decided in the trial context, but, as almost every circuit has opined, the Sixth Amendment, Eighth Amendment do not require counsel in the context of habeas proceedings. In other words, the right to have counsel in a Section 2255 proceeding, again, is a statutory provision, it's not a Constitutional provision. And the 4th Circuit over many, many years has refused to extend trial-type rights to the same degree in habeas proceedings as in trial context. So it would certainly turn things on its head to assume that the statutory -- that the Constitutional provisions that don't apply in habeas context somehow now create a greater

right to counsel in the context of habeas than what applied at trial.

Having said all of that, the point that we're making, Judge, is that there's a statutory provision that gives Mr. Torrez the right to represent himself, that the cases that have been decided under that impose a very similar standard to that as imposed by *Faretta*. Is his decision voluntary? Is it intelligently made? Is it knowing? And if it meets that standard, then he should be allowed to represent himself. If it doesn't, then obviously appointed counsel should represent him.

If the Court decides that he may represent himself, then the Court has to decide whether he should have some sort of standby counsel or some sort of support, other than appointed counsel, and that's, I think, where we are at this point.

In the *Davis* case they did appoint a mental health professional to examine Davis and determined that he was, in fact, competent to make those decisions, and on *mandamus* the Court directed the district court to honor his right to represent himself.

THE COURT: So you think that case law applies to death penalty, 2255?

MR. TRUMP: The *Davis* case was a capital case, Your Honor. It was a case originating out of New Orleans. Davis was a police officer who was charged in a capital case. He was convicted at trial, sentenced to death, and the *Davis* opinion that I cited

emanated from his Section 2255.

And, ironically, it's -- I'm guessing here the issues are very similar to the issues we had at trial, that Mr. Torrez would like to direct the issues that should be presented to the Court and not have certain issues presented in terms of whether certain people should be interviewed and examined for mitigation evidence and whether certain people should just be left alone. Those were similar issues in the *Davis* case. He wanted certain issues presented, and he didn't want certain issues presented, and so the district judge overruled his desires and wanted to proceed with counsel's issues, and that's what led to the 5th Circuit decision.

THE COURT: All right. Thank you. Ms. Heisey.

MS. HEISEY: May I respond?

THE COURT: Yes.

MS. HEISEY: Just to reiterate, Judge, the statute, 1654 that the 5th Circuit held in *Davis*, which provides a statutory right to self-representation, is circumscribed certainly by other rules of the court, and 3599 provides as a default that capital habeas petitions should be counseled and should be handled by skilled and experienced counsel.

And so that's why other courts in handling these requests have found that in their discretion it's not appropriate to remove counsel and allow a petitioner to proceed pro se, and, again, the inquiry is governed entirely by a standard of the

interest of justice, which would not be served by removing us as counsel in a case as complicated as this and where the stakes are as high as they are here. And as Your Honor just said, the public interest, as well, is in a full and fair habeas proceeding here.

THE COURT: All right. Thank you. We'll continue to look at that. All right, then. We'll adjourn this hearing, and we'll get back in touch with you as soon as we know, Mr. Torrez.

THE DEFENDANT: Your Honor, just to notify the Court, I'm still cutting off all communications with my legal team, so if you do file something in the case about me, could the Court send it directly to me? Because if it comes from my attorneys, I'm just going to reject it, Your Honor.

THE COURT: All right. We'll do that. It's just going to be notifying you of any new dates for our come up back here to the courtroom.

Now, are you going to cooperate with the psychiatric examination?

THE DEFENDANT: Yes, Your Honor.

THE COURT: With the doctor?

THE DEFENDANT: Yes, Your Honor. I welcome it. I'm just cutting off communication with my attorneys, Your Honor. No legal calls, no legal visits, no legal mail. Mr. Hundley found a loophole and gave the papers for the memorandum to the officer, and the officer brought it and slid it under my door, and so I

got those, but I'm making sure that that's not happening again in the future, Your Honor.

THE COURT: Okay. All right. That's not wise, but that's your decision for the present, and I'll make sure you get any communications, all right.

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Thank you, all. Have a good weekend. Thank you for coming in today.

MR. TRUMP: Thank you, Judge.

THE COURT: We have another matter, I hope, so we'll stay in session.

(Proceedings adjourned at 11:17 a.m.)

## C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace                8/30/22
---------------------------        ----------------
**Scott L. Wallace, RDR, CRR**              **Date**
**Official Court Reporter**