```
                   UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA


   UNITED STATES OF AMERICA        :
                                   :
               Plaintiff,          :   Criminal Action
                                   :   No. 1:11-cr-00115-RDA-1
        v.                         :
                                   :
   JORGE AVILA TORREZ,             :   February 27, 2023
                                   :   10:15 a.m.
                                   :
                                   :
               Defendant.          :
                                   :
   ............................ :
```

**TRANSCRIPT OF HEARING PROCEEDINGS**
**BEFORE THE HONORABLE LIAM O'GRADY,**
**UNITED STATES DISTRICT COURT JUDGE**


APPEARANCES:

  For the United States:        **James L. Trump, Assistant U.S.**
                                **Attorney**
                                UNITED STATES ATTORNEY'S OFFICE
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                703-299-3700
                                Email: Jim.trump@usdoj.gov

                                **Richard Cooke, Assistant U.S.**
                                **Attorney**
                                UNITED STATES ATTORNEY'S OFFICE
                                2100 Jamieson Avenue
                                Alexandria, VA 22314
                                703-299-3700
                                Email:  Richard.cook@usdoj.gov

APPEARANCES (Cont.)

For the Defendant:                **Joanne Marie Heisey, Assistant**
                                  **Federal Public Defender**
                                  FEDERAL COMMUNITY DEFENDER FOR THE
                                  EASTERN DISTRICT OF PENNSYLVANIA
                                  601 Walnut Street
                                  Suite 545 West
                                  Philadelphia, PA 19106
                                  215-928-0520
                                  Email: Joanne_heisey@fd.org

                                  **Samuel John Browne Angell,**
                                  **Assistant Federal Public Defender**
                                  FEDERAL COMMUNITY DEFENDER FOR THE
                                  EASTERN DISTRICT OF PENNSYLVANIA
                                  601 Walnut Street
                                  Suite 545 West
                                  Philadelphia, PA 19106
                                  215-928-0520
                                  Email: Samuel.angell@fd.org

                                  **Joan Caroline Robin, Esq.**
                                  LAW OFFICE OF JONI C. ROBIN, PLLC
                                  114 N. Alfred Street
                                  Alexandria, VA 22314
                                  703-349-1111
                                  Fax: 703-349-1118
                                  Email: Joni@jonirobinlaw.com

                                  **James W. Hundley, Esq.**
                                  Briglia Hundley PC (Tysons)
                                  1921 Gallows Rd
                                  Suite 750
                                  Tysons Corner, VA 22182
                                  (703) 883-0880
                                  Email: Jhundley@brigliahundley.com


Court Reporter:                   **Scott L. Wallace, RDR, RMR, CRR**
                                  Official Court Reporter
                                  United States District Court
                                  401 Courthouse Square
                                  Alexandria, VA 22314-5798
                                  Cell: 443-584-6558
                                  Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1        <u>**MORNING SESSION, FEBRUARY 27, 2023**</u>

2    (10:15 a.m.)

3        THE DEPUTY CLERK:  The Court calls *United States of*

4    *America versus Jorge Avila Torrez*, Case Number 1:11-cr-115.

5        May I have appearances, please, first for the government.

6        MR. TRUMP:  Good morning, Judge.  Jim Trump and Richard

7    Cook for the United States.

8        THE COURT:  All right.  Good morning to you both.

9        MS. HEISEY:  Good morning, Judge.  I'm Joanne Heisey from

10   the Federal Defender's Office for the Eastern District of

11   Pennsylvania representing Mr. Torrez.  With me is my co-counsel,

12   Sam Angell, as well as Joan Robin, and we have Mr. James Hundley

13   with us as well.

14       THE COURT:  Good morning to each of you.

15       MR. TRUMP:  Good morning, Your Honor.

16       THE COURT:  All right.  Good morning, Mr. Torrez.

17       THE DEFENDANT:  Good morning, Your Honor.

18       THE COURT:  Let me start by kind of explaining why we're

19   here today.  I know you've been waiting for a while for a

20   hearing, and the -- as you know, I appointed Dr. Ratner to

21   examine you for competency, and he came to see you, I think, in

22   January; is that right?

23       THE DEFENDANT:  Not exactly sure on the date, but I saw

24   him.

25       THE COURT:  And how many times did you see Dr. Ratner?

1         THE DEFENDANT:  Once for probably two hours.

2         THE COURT:  Two hours?  All right.  And did that go well?

3         THE DEFENDANT:  I mean, he asked me some questions that I

4    couldn't answer because I don't have my discovery, but, other

5    than that, it went fine for me.

6         THE COURT:  All right.  And you cooperated with him in the

7    questioning --

8         THE DEFENDANT:  Yes.

9         THE COURT:  -- that he did, and you were truthful with

10   him?

11        THE DEFENDANT:  Yes.

12        THE COURT:  How are things at the Alexandria Detention

13   Center?  Are you being treated fairly there, in your estimation?

14        THE DEFENDANT:  Uh, a little bit better than when I first

15   got here.

16        THE COURT:  Okay.

17        THE DEFENDANT:  It's discrimination, basically, because of

18   my charges.  I'm in the admin sec unit with only five people.  I

19   don't come out with nobody.  We used to have a unit worker who

20   cleaned the unit, and he left, and I signed up to try to be the

21   unit worker, and they told me no because of my charges, but

22   what's the reason?  I don't come out as a unit worker.  I have no

23   contact except with the deputies.

24        THE COURT:  All right.  Physically, are you doing well

25   health-wise?

1          THE DEFENDANT:  I guess, Your Honor.

2          THE COURT:  Do you get any exercise at all?

3          THE DEFENDANT:  There's no exercise equipment in the unit.

4     It's a small unit.

5          THE COURT:  Yeah.

6          THE DEFENDANT:  Nothing to do in there, really.

7          THE COURT:  The only exercise is just what you do on your

8     own?

9          THE DEFENDANT:  Yeah.

10          THE COURT:  Okay.  Let's spend a few minutes going back

11     and talking about the history of why we're here.  You wrote me

12     back in April of 2022 and indicated that you no longer wished to

13     be represented by the Pennsylvania lawyers and said -- I'll just

14     quote it.

15          "I have already told my attorneys about my decision to

16     represent myself.  I would like to file a second motion if the

17     need arises for it to void and nullify all forms I have signed

18     for my attorneys that allows them to act in my name or to gather

19     information and documents about me.  I would like this to be on

20     the Court's records.  As of today, I've stopped and cut off all

21     forms of communication with my attorneys, and this includes legal

22     mail, legal calls, and legal visits."  And you signed that letter

23     dated -- it was dated April 1st of 2022, and it got to me on

24     April 5th.

25          You followed that up shortly, within about a month,

1    because you had not heard from me, in a letter you signed on May

2    9th of 2022.  You indicated that you have not received a response

3    to my letter to the Court.  "I'm making this request because I no

4    longer wish to be represented by the attorneys from the Federal

5    Community Defender's Office for the Eastern District of

6    Pennsylvania," and you repeated that, "Just so the Court knows, I

7    have broken off all forms of communication with my attorneys."

8    And you indicated that, "If I contacted them, that you would not

9    be getting that information."

10        So, you followed that up with a letter right before our

11   hearing on July 17th, which is dated July 8th of 2022, and in

12   that letter you spoke about Mr. Hundley, who I had appointed at

13   that stage to represent you, and you said that you had met with

14   him and that Mr. Hundley had been asked for legal advice on how

15   to get rid of your attorneys from Pennsylvania.  And Mr. Hundley

16   advised you not to do so, and you indicated that the best advice

17   he could or would give me was to keep on doing what I'm doing

18   now.  "I can tell by Mr. Hundley's advice to me that he did not

19   want the same things that I want, so how is he to represent or

20   advise me properly?

21        Let me make one thing clear, though.  I asked to represent

22   myself in court.  I did not ask for new attorneys, and I do not

23   want new attorneys.  I can and will speak for myself."

24        And it goes on to indicate that the second time that he

25   spoke with Mr. Hundley he felt that he had, by speaking to the

1    Pennsylvania attorneys, violated your trust, and that you,

2    thereafter, would not speak to him anymore.

3         You also indicated that, "I do not want or need the brief

4    from the attorneys in Pennsylvania.  I hereby make a motion for

5    the Court to disregard and to expunge anything that my former

6    attorneys have filed or will file on or after April 1st of 2022,

7    and this is to include the brief that my federal attorneys have

8    been working on."

9         And then we had our hearing on July 17th, and I appointed

10   Dr. Ratner after that.  It became apparent to me that the

11   decisions that Dr. Ratner has to make are multiple, and that he

12   determined your competency, but not just to understand the

13   proceedings against you in a general sense the way it was at

14   trial, but also in regard to your 2255 petition, which is a

15   little different and, as I indicated, can be a challenge for a

16   layperson.

17        So, I asked the parties to brief the following issues that

18   I would then inform Dr. Ratner about, and they are SIS and to

19   submit briefing addressing the appropriate legal standards to be

20   applied to the following issues:  One, Mr. Torrez's competency to

21   waive and/or right to waive the motion -- the filing of a motion

22   under Title 28 of the United States Code 2255; second,

23   Mr. Torrez's competency and/or the right to file a 2255 motion

24   pro se; third, Mr. Torrez's competency and/or right to decide the

25   issues to be raised by counsel in a 2255 motion.

 1          And the parties briefed those four issues for me, and I

 2    had a copy sent to the Alexandria Detention Center.  Did you

 3    receive the briefs that the parties filed?

 4          THE DEFENDANT:  I did not, Your Honor.

 5          THE COURT:  Okay.  And I think that Mr. Hundley wrote a

 6    pleading to the Court recently indicating that he had tried to

 7    see you, and that you wouldn't speak to him on the telephone or

 8    meet with him in person over the course of the last several

 9    weeks; is that correct, sir?

10          THE DEFENDANT:  He's only tried to come once, which was

11    this past Friday, and I refused the visit.

12          THE COURT:  Okay.  And so you -- you didn't review any

13    documents that he had with him or that he may have had?

14          THE DEFENDANT:  No, Your Honor.

15          THE COURT:  Okay.  Well, that's the purpose of the hearing

16    today, is to, in part, have legal argument about what

17    Dr. Ratner's task is when he writes an evaluation report to the

18    Court about your competency.  I wanted to make sure you

19    understood why we are here today.  Do you have any questions

20    about that?

21          THE DEFENDANT:  Do you have a copy of the documents that

22    you're talking about right now, Your Honor?

23          THE COURT:  I have the pleadings.  I've got -- does your

24    counsel have a copy of the pleadings that he could follow along

25    with if he wants to?

1    MS. ROBIN:  I do have a copy.  I'll see if we have an

2  extra that we could give to Mr. Torrez.

3    THE COURT:  Okay.

4    MS. ROBIN:  Yes, I think we do have an extra set.

5    THE COURT:  Thank you.  Okay.  We can take a recess for

6  you to read those if you would like to.

7    THE DEFENDANT:  We can continue on, Your Honor.  That's

8  fine.

9    THE COURT:  Okay.  The first question I really have for

10  you is -- I'm a little confused as to what you want in terms of

11  legal assistance moving forward.  There seems to be some question

12  as to whether you just want new attorneys who are more aligned to

13  your positions that you think should be taken in this petition or

14  whether you do not wish to have any attorney helping you under

15  any circumstances, and have you made a decision about that?

16    THE DEFENDANT:  I don't want no attorneys, Your Honor.

17    THE COURT:  And why is that?

18    THE DEFENDANT:  Because, as I see it, it's a conflict of

19  interest from what they told me in person, their words.  They

20  have an agreement with the prison not to go after my rights or

21  anything like that.  So, if they want to defend my due process

22  rights, which is through the courts, my envelopes, my stamps, and

23  all that stuff, and my legal discovery that I had at the time, I

24  don't see how they represent my best interest.

25    THE COURT:  Well, that seems to me to be a conflict with

1    present counsel and that you have received information which, I

2    don't know whether it's correct or incorrect.

3         THE DEFENDANT:  I've had bad luck with attorneys since I

4    got arrested, Your Honor.  There was one attorney that was

5    exceptional, and then she turned around and basically stabbed me

6    in the back, so I don't want no more attorneys, Your Honor.

7         THE COURT:  Under any circumstances, even if they didn't

8    have a conflict?

9         THE DEFENDANT:  Yes, Your Honor.

10        THE COURT:  Well, let me ask you this:  Have you reviewed

11   a draft of the 2255 petition that the attorneys in the Eastern

12   District of Pennsylvania have been working on on your behalf?

13        THE DEFENDANT:  Not since long before April of last year,

14   Your Honor.

15        THE COURT:  And in what form was it in at that stage?  Did

16   it include the --

17        THE DEFENDANT:  It was just a draft.

18        THE COURT:  Okay.  So, it included what issues they felt

19   were important during your appeal?

20        THE DEFENDANT:  I believe it was like, what, the Fourth,

21   Fifth, Sixth, and Eighth Amendment violations they were arguing.

22        THE COURT:  Fourth, Sixth, and Eighth Amendment?

23        THE DEFENDANT:  I believe so.

24        THE COURT:  And --

25        MS. ROBIN:  Can I just ask, Your Honor, if we're going to

1    get much more into communications between attorney-client that we

2    be able to do that *ex parte*?

3         THE COURT:  Yes.  I wasn't going to go any further right

4    now, but thank you.

5         MS. ROBIN:  Thank you.

6         THE COURT:  Did you -- so you read that draft of the

7    brief?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  Okay.  And did you disagree with their

10   position?

11        THE DEFENDANT:  The arguments are weak, from the way I see

12   it, Your Honor.  Only two of them were the strongest, and I don't

13   see it going anywhere.

14        THE COURT:  Well, do you feel that you can do a better job

15   if you're given time to research those issues and file a pleading

16   with the Court?

17        THE DEFENDANT:  I don't see that I could do any worse than

18   they have.

19        THE COURT:  Is it your intent to file your own 2255, if I

20   give you that permission?

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  So, you do want to file a 2255 petition to --

23        THE DEFENDANT:  If I can proceed without attorneys, then

24   yes, Your Honor.

25        THE COURT:  And do you have any support, legal support in

1    the Terre Haut prison?  What is your access to the law library

2    or --

3            THE DEFENDANT:  It's just me.

4            THE COURT:  Or do you have -- you know, these days there

5    are a lot of inmates, fellow inmates who have some legal training

6    or at least say they have some legal training that assist inmates

7    in drafting pleadings.  Do you have -- what access do you have to

8    any kind of assistance?

9            THE DEFENDANT:  It's just me and one hour a day at the law

10   library, Your Honor.  That's it.  I don't have no outside

11   support.  I don't have no jailhouse lawyers.

12           THE COURT:  When we were at the trial stage, you know, you

13   had a perceived conflict with your initial attorneys and then

14   fired them and then represented yourself for a while and then

15   decided that you needed counsel, and so we had counsel for the

16   majority of the trial, and then you requested that your attorneys

17   not perform -- not be allowed to move forward with certain

18   defenses, and then the conflict arose there.  Is there a

19   possibility that if you represented yourself and found that you

20   needed counsel that you would seek to have counsel -- further

21   counsel appointed?

22           THE DEFENDANT:  No, Your Honor.

23           THE COURT:  And why is that?

24           THE DEFENDANT:  I'm prepared to draft the appeal right

25   now, and I feel a need to get rid of the attorneys.

```
 1          THE COURT:  You just lost all faith in counsel in any

 2  form?

 3          THE DEFENDANT:  Yes.

 4          THE COURT:  Remind me of your education.  You graduated

 5  from --

 6          THE DEFENDANT:  -- high school.

 7          THE COURT:  High school.  You went into the Marines?

 8          THE DEFENDANT:  Yes.

 9          THE COURT:  Did you have -- have you had any further

10  education, formal education?

11          THE DEFENDANT:  No.

12          THE COURT:  All right.  And the legal knowledge that

13  you've picked up over the years is based on your own --

14          THE DEFENDANT:  Self-taught, basically.

15          THE COURT:  I'm sorry?

16          THE DEFENDANT:  Self-taught.

17          THE COURT:  And as a result of all the different hearings

18  that you've had for the last eight years or nine years?

19          THE DEFENDANT:  Yes, and whatever I could find out at the

20  law library.

21          THE COURT:  Okay.  Have you read the briefs that were

22  filed in the direct appeal after your conviction here?

23          THE DEFENDANT:  Uh, I believe I've read parts of it.  I

24  don't believe I actually sat there and read the whole thing

25  through, because I was also depending on counsel back in those
```

1   days.

2        THE COURT:  Did you read the Fourth Circuit's opinion on

3   the appeal?

4        THE DEFENDANT:  I haven't -- it's been a while since I've

5   done that, Your Honor.

6        THE COURT:  Okay.  It was probably sent to you back then,

7   and you read it after it was filed.

8        THE DEFENDANT:  At one point, I thought I wouldn't need my

9   discovery no more, and I gave it all to the attorneys, so --

10  They're the ones with all the discovery and all the reports and

11  everything, all the briefs.

12       THE COURT:  Have you looked at what a petition under 18

13  U.S.C. 2255 allows you to appeal and what issues can be contested

14  in a 2255?  I know you mentioned the Fourth, Sixth, and Eighth

15  Amendments.

16       THE DEFENDANT:  I know the appeal has to do with the Court

17  errors and stuff like that.  The habeas corpus is basically the

18  violations to the amendments of the Constitution.  I understand

19  that, Your Honor.

20       THE COURT:  Okay.  And effective assistance of counsel, do

21  you understand that?

22       THE DEFENDANT:  Yes, yes.

23       THE COURT:  And the Eighth Amendment is cruel and unusual

24  punishment.  Is that what your understanding is?

25       THE DEFENDANT:  I don't know all the amendments off the

1  top of my head, but I do have them printed out at the jail.  I

2  know the Fifth one is pleading the Fifth.

3          THE COURT:  All right.  So you've done that research?

4          THE DEFENDANT:  Yes, I have, Your Honor.

5          THE COURT:  As it applies to a 2255 versus a direct

6  appeal?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  All right.  That's all the questions that I

9  have for you right now.  Do you have any questions for me based

10  on what we've just discussed?

11          THE DEFENDANT:  Just the communications with the Court.

12  You said you sent me something to the jail.  I never received it,

13  so I don't know what's going on there with that.

14          THE COURT:  I'm not sure either, but I'll investigate that

15  because I wanted to make sure you had these briefs before we had

16  our hearing.  I mean, just for your own benefit.  But, you see --

17  are these extra copies that he can take with him at the end of

18  the hearing today?

19          MS. ROBIN:  Yes, he can.

20          THE COURT:  Okay.  All right, then.  I'm going to turn to

21  counsel now for any legal arguments.  I mean, this is what I

22  consider to be preliminary questioning of Mr. Torrez to get an

23  idea of where he stands today, and there will be necessary

24  subsequent questioning once Mr. Ratner's report has been issued.

25  But I wanted to give the parties an opportunity to listen to

1    Mr. Torrez so he could tell us where he stands today.  So I'll

2    hear any argument from you to begin.  Thank you.

3        MS. ROBIN:  Thank you, Your Honor.  We understand

4    Mr. Torrez's position, his desire to represent himself, but he

5    doesn't have a right to self-representation in 2255 proceedings.

6    The Supreme Court has made clear that *Faretta*'s Constitutional

7    right to self-representation is limited to the trial context, and

8    so there's no Constitutional right in this context that we're in

9    now for him to represent himself.

10       THE COURT:  Well, has the Supreme Court been clear that he

11   doesn't have a fright to represent himself in a 2255 or 2254?

12       MS. ROBIN:  So, the Supreme Court has addressed that

13   question in the context of an appeal.  That was the holding in

14   *Martinez,* and it held that there was no Constitutional right to

15   self-representation there, but the Court in holding that made

16   clear that *Faretta*'s right is limited to the trial context, and

17   so other courts that have addressed this question in the 2255

18   context have held that *Martinez* applies there as well and that

19   there's no Constitutional right outside of the trial context, and

20   that extends to 2255 and 2254 proceedings as well.

21       THE COURT:  You know, there's obviously a lot of district

22   court decisions that suggest that the judge ultimately makes a

23   decision on whether an inmate under 2255 should have the right to

24   represent himself and draft an opinion, and it appears that

25   Mr. Torrez intends to file an appeal, which was an issue that I

1  was uncertain of until this morning, and that he's had the

2  benefit of reading a draft of your pleading and also having done

3  research on 2255.

4      MS. ROBIN:  And just to clarify, Judge, I'm not sure what

5  Mr. Torrez was referring to as far as having reviewed a draft,

6  because we did not have any draft of the habeas petition put

7  together at the point at which he wrote the Court asking to

8  represent himself.  So I'm not sure what he's recalling having

9  reviewed.  I'm not sure what that was, but it was not a draft of

10 the petition.

11     THE COURT:  Where are you today on the petition?

12     MS. ROBIN:  Well, we've -- so, at the point when we were

13 here last August, as we discussed, we were sort of wrapping up

14 our investigation that had been delayed for periods of time due

15 to the pandemic, and that we were able to wrap up shortly after

16 that hearing last year, and so we've -- I would say we've

17 completed our investigation and would be ready to file at any

18 point.

19     THE COURT:  So, knowing that Mr. Torrez isn't going to be

20 available for any further communications, you would be prepared

21 to file a legal brief in the near future and have a draft of that

22 now?

23     MS. ROBIN:  That's right.

24     THE COURT:  Okay.  All right.  Thank you.  Go ahead.

25     MS. ROBIN:  So -- and as Your Honor mentioned, these other

1    district courts that have addressed this question have found

2    that, because there's no right to self-representation in this

3    context, that it is up to the Court's discretion, and what the

4    Court should consider is the interest of justice in deciding

5    whether Mr. Torrez should be allowed to represent himself in

6    these proceedings, which, by their nature, are extremely complex,

7    are ripe with risks for forfeiture of claims, and which the

8    Supreme Court has explained that provision of counsel in these

9    proceedings is necessary to ensure a full and fair proceeding and

10   to ensure a fair imposition of the death penalty.

11        Obviously, these sorts of proceedings are very heavy on

12   legal research and writing.  They require investigation of facts

13   outside of the record, they require work with experts, and I

14   would be very doubtful that Mr. Torrez would be capable of doing

15   any of those things in a way that would afford him a full and

16   fair proceeding here.

17        THE COURT:  All right.  I don't have any other questions

18   for you at this time.

19        MS. ROBIN:  Thank you.

20        THE COURT:  All right.  Mr. Trump, Mr. Cooke.

21        MR. TRUMP:  As to the Court's initial question as to what

22   further work Dr. Ratner has to do, I don't know where he is in

23   his process, but obviously step one is to determine whether

24   Mr. Torrez suffers from any sort of mental disease or defect that

25   would render him unable to make voluntary, knowing decisions

1   about his future.

2         That was done before.  Dr. Ratner determined he was not

3   suffering from such mental disease or defect.  I'm fairly

4   confident that that will be the result again.

5         But the next step is to determine, to what extent he can,

6   what is his intellectual capability.  Is he able to understand

7   the consequences of his decision to waive counsel?  Is he able to

8   understand the basic legal issues that confront him?  Not being a

9   psychiatrist or psychologist, I'm not sure exactly how that

10  process works, but that would be Dr. Ratner's second task.

11        In our briefs, we discussed the issue of waiver of a 2255

12  filing.  I guess that's not an issue at this point, but if it

13  were, Dr. Ratner would have to discuss with Mr. Torrez the

14  consequences of that decision.

15        As far as the arguments concerning the Constitutional

16  right, even if we agree that there's no Constitutional right to

17  self-representation, we do believe there is a statutory right.

18        This whole argument is full of irony, Your Honor.  For

19  example, a defendant sentenced to life without parole has no

20  statutory right to counsel and is, perhaps, compelled to proceed

21  *pro se* under a Section 2255 proceeding, yet we're standing here

22  arguing whether Mr. Torrez is capable of doing that himself when

23  he's faced with, obviously, the most severe penalty.

24        But given the fact that the analysis in *Faretta* and the

25  analysis of the subsequent cases, if you have a right, you have a

1   right to waive it.  That was, in fact, the Supreme Court's

2   analysis.  I'm not sure how that changes in the statutory

3   context.  If there's a statutory right, isn't the same analysis

4   applicable; that if you have a right, you have a right to waive

5   it?

6       I think we all agree that, as attorneys, we would rather

7   deal with counsel, having tried a case, a capital case with a *pro*

8   *se* defendant and having encountered in our most recent trial,

9   Judge, where there are difficulties, both legal and practical, of

10  dealing with a *pro se* defendant, so I'm standing here at the

11  podium not suggesting that it would not be to the advantage of

12  both parties to deal with a represented defendant, but the

13  question is whether Mr. Torrez has the right to waive counsel,

14  and I think he has a statutory right to counsel; he has a

15  statutory right to waive counsel.

16      If we go a step further and say, well, it's up to the

17  Court's discretion, I think then the Court's discretion can't be

18  exercised at this point.  The Court's discretion would have to

19  wait for a proceeding in which Dr. Ratner has filed a report and,

20  perhaps, a more fulsome *ex parte* colloquy with Mr. Torrez as to

21  what he wants.

22      When we were faced with this decision before, Mr. Torrez's

23  initial request to the Court was to fire his attorneys and

24  proceed *pro se*.  It then became clear that what he wanted to do

25  was direct his attorneys' strategic decisions.  And, again, if

1    that's where we end up here -- again, I find it somewhat ironic

2    that counsel's insistence that they have complete control over

3    the issues to be presented to the Court in a 2255 context would

4    force Mr. Torrez to make a decision to jettison counsel versus

5    trying to work with him and decide which issues should be

6    presented would not be the better course for Mr. Torrez.

7         I just -- it's difficult to comprehend how that would not

8    be a more favorable outcome here if that is possible.  Bottom

9    line, I suggest to the Court that we direct Dr. Ratner to proceed

10   with his evaluation, provide the Court and the parties with the

11   report.

12        Step two would be to have a subsequent hearing at which --

13   after Mr. Torrez has read all the pleadings, has had the benefit

14   of seeing Dr. Ratner's report, and perhaps at some point then

15   either *ex parte* or at a hearing discuss with him what his

16   preferences are.

17        Again, as before, perhaps he will change his mind and

18   decide that, if counsel is willing to sit down and work out a

19   pleading that's to his satisfaction, that he would proceed with

20   counsel, or, perhaps, he will insist that he proceed *pro se*, but,

21   either way, I guess I still can't wrap my head around the

22   argument that he has absolutely no right to make decisions about

23   his legal future.  That just does not seem to be both a legal and

24   a practical consequence.

25        As we point out in our briefs, Your Honor, and as, again,

1   someone who has gone through this, to say that a habeas

2   proceeding is so complex that no defendant should be allowed --

3   no capital defendant should be allowed to proceed *pro se* really

4   turns the whole *Faretta* thing on its head.  A trial is just as

5   complicated as a habeas proceeding, Judge.  In fact, the legal

6   issues confronting a defendant at trial, the evidentiary issues,

7   the hearsay rule, impeachment, all of those issues, the judgment

8   that's required to represent yourself at trial is certainly as

9   complicated, if not more complicated, than a habeas petition.

10          So, again, I do take issue with counsel's position that

11   somehow we put the habeas process up on a pedestal and say that

12   is so complicated that Mr. Torrez can't do it himself.

13          As a legal matter, I don't think he can do it himself.

14   That's just the way it is.  And as a legal matter, I don't think

15   many defendants can represent themselves very adequately at

16   trial, but they have the right to do so, and that's where we end

17   up, Judge.

18          THE COURT:  What additional information do you think

19   Dr. Ratner should have before he drafts his report and/or visits

20   with Mr. Torrez again?  And prior to my request for additional

21   briefing, Dr. Ratner had been prepared to speak with Mr. Torrez,

22   I think, and I don't know if he arranged a date to speak, but he

23   fully intended to explore what goes into a 2255 petition so that

24   he had a better understanding of it as a matter of law so then he

25   would be able to further evaluate Mr. Torrez's ability to draft

1    such a pleading himself?

2        MR. TRUMP:  I would have no problem with Dr. Ratner

3    sitting down with counsel and going through the types of

4    questions that counsel would suggest that Dr. Ratner ask

5    Mr. Torrez.

6        Again, I don't know how specific a psychologist or

7    psychiatrist would want to believe -- or would want to be with

8    Mr. Torrez, but to the extent that he needs some background in

9    what Mr. Torrez faces in terms of drafting and filing and

10   litigating a habeas petition in this context, whatever advice and

11   questions they can provide is fine with us, Judge.

12       THE COURT:  All right.  I think that would be advisable,

13   yes.  All right.  Thank you, Mr. Trump.

14       MS. ROBIN:  May I just respond?

15       THE COURT:  Certainly.

16       MS. ROBIN:  Well, I just would like to respond to the

17   discussion of whether there's a statutory right to

18   self-representation here, because, again, most courts that have

19   addressed this question have not found there to be a statutory

20   right either.  We're aware of one unpublished Fifth Circuit case

21   finding that there was a statutory right under Section 1654, but

22   that's not what most courts that have addressed this question

23   have held, and I don't think that it's true that if you have a

24   right -- for instance, if you have a right to counsel here, that

25   you automatically have a right to raise it, because that's the

1  opposite of what the Supreme Court held in *Martinez* where, of

2  course, the petitioner there had a right to counsel in an appeal,

3  and the Court held that he didn't have a right to waive counsel;

4  he didn't have a right to represent himself.  So, I don't think

5  it's true that just because there's a right, there's a right to

6  waive.

7       Again, most of the courts that have addressed this issue

8  have found there's no right to self-representation in this

9  context for the reason that provision of counsel is, by default

10 in 2255 proceedings, for the reason that they are so complex and

11 they require --

12      THE COURT:  So, it's an interesting conflict there, which

13 Mr. Trump brought up in the pleadings, which is that, you know,

14 the defendant has a right to ultimately decide his or her

15 defense, and that lawyers are agents who do not have the final

16 decision on whether to argue for or, you know, argue against the

17 death penalty.  In Mr. Torrez's case or in the *Reese* case

18 where -- a recent Fourth Circuit case -- where a defendant says,

19 I don't want to bring up prior convictions or I don't want my

20 mental health history to get in front of the jury, and, you know,

21 the courts have said that's a right that a defendant has.  He's

22 competent and understands.  And so there's a huge conflict there

23 in this setting because Mr. Torrez is saying, I didn't like what

24 I saw, even if it was some preliminary document, and I don't

25 trust counsel to finalize a pleading, and you're saying he has no

1    right in this context, which is, you know, outside of the -- the

2    government has cited a hundred-year-old case from Justice

3    Friendly, and that ultimately it is a defendant's choice.  So,

4    there clearly is -- courts over the years have grappled with this

5    decision, and, you know, the best solution was addressed by

6    Mr. Trump, who said counsel and defendant should work together

7    and decide ultimately what to file in the court.  That's not

8    likely to work here.  What about a situation where a pleading is

9    filed by you, and then Mr. Torrez has the opportunity to file a

10   supplemental pleading if he wishes to do so?  If you had a

11   situation where that arose, what would be your reaction to that?

12        MS. ROBIN:  We have, Your Honor.  We've had other cases

13   where hybrid representation has been permitted, and I think that

14   could be an option here, for the Court to consider claims or

15   issues raised by counsel, as well as those raised by Mr. Torrez.

16   We haven't -- I don't think that there's been any sort of dispute

17   with Mr. Torrez as to what should or shouldn't be raised in a

18   habeas petition because we have never reached the point of even

19   having those discussions with him at the point at which he moved

20   to proceed *pro se*.  So I can't say that that's what's happening

21   here, that there's some sort of dispute about claims, because

22   we've never reached the point of actually having those

23   discussions with Mr. Torrez.

24        But as far as the delineation of the rights and duties of

25   a client vis-à-vis counsel, the client does have the right to set

1    the objectives of the representation, but it's up to counsel to

2    determine the strategy, and there are only certain limited

3    decisions that counsel has -- or I'm sorry -- that the client has

4    an absolute right to make, such as whether or not to plead

5    guilty, whether or not to waive a jury, whether or not to

6    testify, et cetera.

7         In *Ruth* {ph}, of course, Mr. Ruth had waived any

8    presentation of mitigating evidence at his penalty phase, but he

9    was representing himself there, so it wasn't a context where he

10   was represented by counsel.

11        The Fourth Circuit on appeal held that if he had been

12   represented by counsel, that the decision of whether or not to

13   present mental health evidence at the penalty phase would have

14   been a strategy decision rather than an objective decision to be

15   made by the client.

16        So, I think that's where, you know, the delineation of the

17   rights and responsibilities are there.

18        I also just want to make clear what standard Dr. Ratner

19   should be applying when he's determining Mr. Torrez's right to --

20   or I'm sorry, competency to represent himself, because the

21   government framed it as, whether he has a mental disease or

22   defect such that he would be able to make rational decisions, but

23   the standard here for him to represent himself is much higher

24   than that.  It's not the *Dusty* standard to proceed to trial, it's

25   the standard announced under *Indiana versus Edwards* to represent

1    himself, which means his ability to handle the proceedings, and,

2    of course, we're talking about a 2255 capital habeas proceeding

3    here which, by its very nature, is complicated, entails -- it's

4    heavy in legal research and writing, requires investigation

5    outside of the record, all of which Mr. Torrez would be very much

6    hampered in his ability to do.

7         That's all I have, if Your Honor doesn't have any further

8    questions.

9         THE COURT:  Thank you, Ms. Robin.  Mr. Trump, do you want

10   to respond to the last --

11        MR. TRUMP:  Your Honor, I think I was pretty clear.  I did

12   not say that Dr. Ratner's examination ends with a finding that he

13   has the ability to make knowing and voluntary -- I followed that

14   up by saying that the second step is to determine the extent of

15   his, you know, intellectual capacity, and for that he would have

16   to be examined with respect to the legal proceedings that he now

17   faces, which is exactly why I said to the Court that I would have

18   no objection to Dr. Ratner sitting down with counsel and coming

19   up with a colloquy to address that issue.

20        Again, I don't think we'll agree on the proper legal

21   standard.  I think on page 6 of our pleading we lay out our

22   argument very clearly that we basically disagree that it is as

23   stark a choice as defense counsel makes out, that Mr. Torrez

24   simply has no right to waive counsel.  I don't think that's the

25   law.  We don't think that's what the courts have decided, both in

1    terms of a noncapital 2255 situation or a capital situation.

2          THE COURT:  Thank you.  Well, I would like Mr. Torrez to

3    receive a copy of the draft and have a chance to review the draft

4    petition.  And, of course, Mr. Torrez, you're free to consult

5    with counsel if you wish about it, but I want you to have it in

6    your -- you to have reviewed it so you understand the arguments

7    that they wish to make on your behalf in that pleading.

8          And I will ask Dr. Ratner to speak with counsel about the

9    work that they're doing on your behalf and what goes into a 2255

10   petition filing before he comes back, and then I'll ask him to

11   visit with you again.

12         Is there anything else that you would like to make sure I

13   get to you before -- besides that draft and before Dr. Ratner

14   visits you next time?

15         THE DEFENDANT:  I mean, I would like all my discovery,

16   Your Honor.  If you're going to allow me to proceed *pro se,* I'm

17   going to need all of my discovery that the attorneys have.

18         THE COURT:  I haven't made that decision yet.

19         THE DEFENDANT:  I mean, that would help me out a lot to

20   answer the questions that Dr. Ratner has for me.

21         THE COURT:  Right.  Where is his discovery?

22         THE DEFENDANT:  Counsel has all the discovery.

23         THE COURT:  Pennsylvania counsel has your discovery?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And what do you mean by the word "discovery"?

1          THE DEFENDANT:  All the expert reports, police reports,

2     autopsies, everything that -- basically all the three or four

3     cases that I had that they put together.  It was all put on a

4     laptop.  So, there was so much paperwork that the jail didn't

5     want me to have it, so the workaround was to put it on a laptop

6     and give me a laptop.  They have the laptop.  I asked them where

7     it was, and they told me they had it.  I tried asking the jail if

8     they will allow me to get it again, but they're telling me that

9     counsel has to do it, but I'm trying to go *pro se*, I don't have

10     counsel, so that's where my issue comes in at.

11          THE COURT:  Ms. Heisey, what is your response to that?

12          MS. HEISEY:  I'm sorry, I didn't understand -- I'm sorry,

13     Judge.  I didn't understand when you were saying that we could

14     have brought it in on a laptop.

15          THE DEFENDANT:  That's the problem, Your Honor.  There's

16     no communication between the attorneys because the federal public

17     defenders that I had originally were sending me documents like

18     this (indicating), but the jury questionnaires, the transcripts

19     and everything, I had stacks of paperwork in my cell, so it was

20     all put on a laptop by the federal public defenders.  When I got

21     new counsel for the appeals and all that stuff, they passed on

22     the laptop.  I specifically asked the Pennsylvania attorneys,

23     where's that laptop?  And they told me they had it -- one of them

24     told me they had it.  So, where is this laptop at?

25          THE COURT:  Well, this is the record from the trial court

1   and the original direct appeal?

2       THE DEFENDANT:  Yes, Your Honor.

3       THE COURT:  Not the work product of Ms. Heisey and her

4   group, right?

5       THE DEFENDANT:  It was before them.

6       THE COURT:  Okay.

7       MS. ROBIN:  Yeah.  I know that that had happened when

8   Mr. Torrez was represented by the attorneys from the Eastern

9   District of Virginia, that there was a laptop that had discovery

10  on it that he was able to view at the jail, but, as far as I

11  know, we are not in possession of that, unless co-counsel has a

12  representation.

13      THE DEFENDANT:  That's my issue, Your Honor.  There's

14  no -- that's what they told me, and now they're saying this.

15  That was the problem before.  Like I told you, they said they

16  didn't show me nothing to do with the brief or whatever.  All the

17  visits that I've had with them at the prison three to four hours

18  long, what are we talking about then if it wasn't legal discovery

19  and all this stuff?  Like I told you before, they'll spend five

20  or ten minutes talking about the case, and then we'll talk about

21  something else for the rest of the time.  What do I need counsel

22  for?  There's no communication between us.  There's no --

23      THE COURT:  Okay.  Who's the lead counsel in the direct

24  appeal that you think may have had possession of a computer?  Do

25  you recall who?

```
 1          MR. TRUMP:  Well, it wasn't trial counsel.

 2          THE COURT REPORTER:  I'm sorry, say that again.

 3          MR. TRUMP:  I know it wasn't trial counsel, but I don't

 4   know off the top of my head the name of the attorney.

 5          THE DEFENDANT:  Robert Jenkins maybe.

 6          MR. TRUMP:  No, no.  I can see his face from the oral

 7   argument in front of the Fourth Circuit, but I don't --

 8          THE COURT:  Would you --

 9          MR. TRUMP:  I thought it was Julie Stelzig, who was the

10   counsel on direct appeal for Mr. Torrez.

11          THE COURT:  How do you --

12          MR. TRUMP:  She's out of the Federal Public Defender's

13   Office out of Maryland.

14          THE COURT:  In Maryland.

15          MR. TRUMP:  But she didn't argue the case before the

16   Fourth Circuit.

17          MR. COOKE:  According to the Fourth Circuit's decision,

18   Ms. Stelzig argued.

19          MR. TRUMP:  I may be confusing my --

20          THE DEFENDANT:  -- too many attorneys, Your Honor.

21          MR. TRUMP:  But I know that trial counsel had kept most of

22   the material on their tablets, which they used in court.

23          THE COURT:  Right.

24          MR. TRUMP:  I don't know if that's what they gave to

25   appellate counsel.  There's certainly a digital copy of an
```

```
1    appendix --

2         THE COURT:  Right.

3         MR. TRUMP:  -- at the Clerk's Office in the Fourth

4    Circuit, but -- you know, obviously I don't know what habeas

5    counsel has put together.  I just don't.  I don't know if they

6    had access to trial counsel's files or whatever.

7         THE COURT:  Yeah.  I'll look to find that computer and see

8    whether I can make it available to you at the Alexandria

9    Detention Center.  Are you allowed to go to the library at the

10   A.D.C.?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  Okay.

13        THE DEFENDANT:  They just recently got tablets at the

14   jail, and the law library has the tablets.  It's actually a

15   little more complicated than actually going to the law library,

16   but I'm managing to navigate a little bit.

17        THE COURT:  Okay.  All right.  Well, I'll see if I can get

18   that to you, but what I want you to focus on is carefully

19   reviewing the draft of the petition that counsel has generated

20   and think about that carefully.  I'll try to get you the fact

21   discovery from your original case on the laptop or a substitute.

22   The record that went down to the Fourth Circuit, I'm sure, is

23   really lengthy, maybe difficult to navigate, but it's broken down

24   pretty extensively, so it may be something that -- and that,

25   frankly, I'm not sure how I'm going to get that to you, but I
```

1   will attempt to get you the original records.  But I really want

2   you to get a -- take a close look at the that's been worked up

3   for you, all right?

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  And I don't know Dr. Ratner's schedule.  I'm

6   sure it will be four to six weeks before he has an opportunity to

7   speak with counsel.  If he gets a draft of the brief as well or

8   it's explained to him and he gets a break and can go see you, he

9   then needs to generate a report, and I think he had been working

10  on the report.  I have no --

11       THE DEFENDANT:  I'm welcome to see somebody else if it

12  helps the Court, Your Honor.  It doesn't have to be Dr. Ratner.

13       THE COURT:  No, I want Dr. Ratner.  He's already started

14  it and has been working on it.  We can't get a psychiatrist any

15  sooner than that these days.  They're all so busy, and he's a

16  seasoned veteran in forensic psychiatry.  So don't,

17  unfortunately, expect that we'll be back here in three weeks.  I

18  wish we could, but that's being too optimistic.

19       If you want something, just write another letter to me.

20  But I want you to wait until you get a draft of the brief, and

21  I'll write you and tell you what progress I have made on getting

22  you the discovery.

23       For now, I'll ask all counsel to remain in their present

24  positions until further notice.  Is there any objection to that,

25  including Mr. Hundley?  And as I've said, when I asked

1   Mr. Hundley to get involved in the case, I know that you were

2   upset when he spoke to Pennsylvania counsel, but how's he going

3   to understand how to advise you if he doesn't know what prior

4   counsel has done?  He was just doing his job.  He's a wonderful

5   veteran of serious cases that have gone on here in the Federal

6   Court in Alexandria, and he's not a friend of the government.

7   He's not a friend of the Court.  He's a lawyer who represents his

8   clients very zealously, and he certainly wasn't trying to work on

9   behalf of the Pennsylvania lawyers.  He was trying to understand

10  what was going on.  So keep that in mind.  I don't know whether

11  you want to have any further contact with Mr. Hundley.  I think

12  that you should use him as a future resource, especially if you

13  have legal questions and you still are not willing to speak with

14  your Pennsylvania counsel.  It's an option for you, and I want

15  you to keep an open mind about that, all right?

16          THE DEFENDANT:  I understand, Your Honor, but I want no

17  more communication with the attorneys.

18          THE COURT:  Okay.

19          THE DEFENDANT:  I understand that he had to talk to the

20  counsel, I understand that, but it's not that he talked to them,

21  it's that he told them everything that I told him.  It's

22  basically me versus the counselor right now.  I'm trying to get

23  rid of them.  We're at opposite ends.  And so I have my game

24  plan.  When I told him my game plan, and he goes and tells the

25  counsel that, then it's a violation of my trust.  He talked to

```
 1   counsel.  He told the counsel what I said.  That's not right.
 2          THE COURT:  Okay.  I understand your problem with that,
 3   and if you make it clear to Mr. Hundley in the future that
 4   nothing that you tell him should be told to anybody else, he'll
 5   honor that, okay?  No doubt about that.  I think that must have
 6   been unclear to him.  All right.  Anything further this morning
 7   that we should raise?
 8          MR. TRUMP:  Other than when we should meet again.
 9          THE COURT:  I will contact Dr. Ratner and give him -- and
10   ask him to contact Ms. Heisey.  Do you want him to contact you
11   directly?
12          MS. HEISEY:  Yeah.  That would be great.  Thank you.
13          THE COURT:  And also any objection to him receiving a
14   draft of the 2255 petition?
15          MR. TRUMP:  That's between you, Mr. Torrez, and counsel.
16   Whatever you want to give him is fine with us.
17          THE COURT:  Okay.  All right.  Ms. Heisey, do you have any
18   objection to giving it to him?  Is it too much information?  I
19   would like him to have both.
20          MS. HEISEY:  I think that will be fine.
21          THE COURT:  All right.  Then I'll tell them -- and can you
22   send that to him, you know, in a confidential form?
23          MS. HEISEY:  Yes, yes.  Will do.
24          THE COURT:  All right.
25          MR. TRUMP:  Procedurally, we've been in a sort of
```

```
 1    suspended stage, and we will continue that.  We've informed
 2    counsel that the government's agreement not to object to an
 3    out-of-time filing will continue through the end of these
 4    proceedings in determining what -- which way we will go, either
 5    with counsel or without counsel.  That remains the case.
 6         THE COURT:  Thank you for that.  So, your right to file an
 7    appeal is preserved, even though the time for it has run.  But
 8    because of COVID and because of our present hearings, you're
 9    not -- you'll have the ability to file the petition in the
10    future.
11         THE DEFENDANT:  Yes, Your Honor.
12         THE COURT:  Okay.  All right.  Well, thank you, all, for
13    getting together in a little bit of short notice there, and I
14    appreciate it very much, and I'll get whatever I can get from
15    Dr. Ratner, and we'll communicate with you as soon as I know more
16    and set up a future hearing date in conjunction with Dr. Ratner's
17    schedule and your own, of course.  All right.  Thank you, all.
18    We're in recess.
19         (Proceedings adjourned at 11:08 a.m.)
20
21
22
23
24
25
```

1

2

## C E R T I F I C A T E

3

                    I, Scott L. Wallace, RDR-CRR, certify that
4       the foregoing is a correct transcript from the record of
        proceedings in the above-entitled matter.

5

         /s/ Scott L. Wallace                    10/23/23
6        ---------------------------          ----------------
          Scott L. Wallace, RDR, CRR              Date
7           Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25